2003 SD 114

**In the Matter DISCIPLINE OF Gwendolyn L. LAPRATH as an Attorney at Law.**

**No. 22356.**

Supreme Court of South Dakota.

Argued Aug. 28, 2003.

Decided Sept. 17, 2003.

Robert B. Frieberg, Beresford, South Dakota, Attorney for Disciplinary Board.

Gwendolyn L. Laprath, Gregory, South Dakota, Pro se.

GILBERTSON, Chief Justice.

[¶ 1.] This is a disciplinary proceeding against Gwendolyn Laprath, [Laprath] a member of the State Bar of South Dakota. The Disciplinary Board of the State Bar of South Dakota has recommended disbarment. The Referee also recommended disbarment. Laprath, who has acted pro se throughout these proceedings, asks that there be no sanction against her and that she be allowed to retain her license to practice law.

### GENERAL BACKGROUND

[¶ 2.] Laprath is fifty-three years old. She and Tom Laprath were married in 1971 and divorced in 1990. Their son Ben is a police officer in Sioux City, Iowa. Their son Sam is fifteen years old and lives with Laprath.

[¶ 3.] Laprath received a B.S. degree in home economics with an emphasis in child development and psychology from Colorado State University in 1973. Two years later she received an M.A. in ele-

mentary education from the University of Northern Colorado. After working for the Cheyenne River Sioux Tribe writing health grants and taking time off to spend with her first child, Laprath began law school at Hamline University in 1980. She completed her second and third years of law school at the University of South Dakota School of Law. She was admitted to practice law in South Dakota on diploma privilege on May 17, 1983.

[¶ 4.] Since then Laprath has been engaged in the practice of law in central South Dakota except for the two year period following her divorce when she lived in Colorado and worked for a law firm there. She currently is a solo practitioner engaged in the general practice of law in Gregory, South Dakota. She currently has twenty open files. Her practice primarily consists of criminal, probate, wills, divorce, family law and business matters. She does not practice in the areas of malpractice, medical injury and bankruptcy and recently quit doing trust work.

[¶ 5.] Laprath is buying the building that serves as her office and home. She has no regularly employed support staff. She does her own document drafting on a computer. However, she does not do her accounting on the computer. Rather, she does it manually.

[¶ 6.] Laprath's office law library consists of outdated sets of SDCL, AmJur2d and federal statutes. She accesses the South Dakota Code and Supreme Court decisions through the Internet. She travels to the law library in Winner to use current sets of the federal statutes, SDCL, AmJur2d, North Western Reporter 2d and their indices.

[¶ 7.] Laprath has one checking account. She uses it for her law office business as well as personal expenses. She has judgments against her stemming from matters relating to her divorce. She has unpaid hospital bills from surgeries she required over the past several years. Laprath does not maintain malpractice insurance and has not since 1998. However, she has never been sued for legal malpractice. In compliance with Rule 1.4(c)(2) of the Rules of Professional Conduct, her letterhead does indicate that "This firm is not covered by professional liability insurance."

[¶ 8.] Laprath has been the subject of six previous disciplinary complaints. The first, in 1987, was dismissed. The second, in 1988, resulted in the imposition of a private reprimand. The third in 1990, resulted in an admonition. The fourth, in 1991, resulted in a private reprimand. The fifth, in 1997, resulted in an admonition and the sixth, in 2001, was dismissed. The sanction of a private reprimand is a finding of a serious rule violation resulting in harm to a client, or a serious rule violation that was intentional. An admonition is a finding of a rule violation that does not result in harm to a client greater than de minimus. Additional complaints are pending in this disciplinary proceeding.

## I.

## JOHNSON COMPLAINT

### A.

[¶ 9.] On June 10, 1998 Laprath's former husband, Tom, was disabled in a plane crash. Laprath cared for his personal needs. She also represented him in proceedings before the Social Security Administration.

[¶ 10.] Following a second application Tom was found eligible for social security benefits. Laprath assumed the role of Tom's representative payee. She was charged with the duty of managing his benefits and using them for his best inter-

ests. Tom received a lump sum award of $11,304 in December 2000. Although she had no attorney fee agreement with or approval from Tom, nor any order from the Social Security Administration regarding attorney fees, Laprath paid herself twenty-five percent of the lump sum award as attorney fees. The $2,826 check, dated December 11, 2000 was made payable to Laprath, as attorney, and signed by Laprath, as personal payee.

[¶ 11.] On January 21, 2001 Laprath, who still had no written fee agreement with Tom, paid herself $1,590 attorney's fees for guardianship proceedings from Tom's social security funds that she controlled as representative payee. In a letter on January 25, 2001 Laprath billed Tom $2,811.21 for attorney fees for the guardianship and conservatorship as well as her personal services. A memo to Tom, dated January 29, 2001 billed him for $2,385 as "an advancement on attorney fees to draft a Guardianship/conservatorship petition and Motion for Temporary Appointment, with affidavits, notices, and Sam's guardianship to achieve service upon Sam, a minor child[.]"

[¶ 12.] On January 29, 2001 Laprath, as client and representative payee for Tom and Sam Laprath entered into what was denominated as a "Contingent Fee Agreement" with Laprath, attorney at law. In this agreement Laprath, as client, retained Laprath, as attorney, to "file and prosecute a guardianship/conservatorship for Tom J. Laprath and guard/conserve on Sam Laprath, a minor."

[¶ 13.] On January 31, 2001 Laprath filed a petition for the appointment of a guardian and conservator for Tom Laprath a/k/a Tom J. Laprath. In the petition she requested that she and her son, Ben, be appointed as guardians and conservators, as well as temporary guardians and conservators. She presented an ex parte "Order Appointing Temporary Guardian and Conservator" to Circuit Judge Kathleen Trandahl. The order was signed and filed on January 31, 2001. It provided for a hearing on the petition for appointment of guardian and conservator on February 6, 2001.

[¶ 14.] Laprath never discussed her intention to file the petition for guardianship with Tom, nor did she provide him with prior notice. On February 2, 2001 Tom was served with a copy of the petition, the ex parte order and the notice of hearing. Tom promptly retained attorney Rick Johnson to resist the guardianship. Laprath was informed and on February 5, 2001 she wrote to Johnson and told him that she was Tom's payee, temporary guardian and conservator who was owed "more like $20,000 in legal fees given already." Johnson responded by letter on February 8, 2001. It provided, in part:

> I have had an opportunity to meet with Tom. He doesn't seem to be incompetent at all to me. I'll have to admit that Tom nearly had a heart attack on your last letter where you are claiming legal fees in the amount of $15,000 to $20,000 for helping him.
>
> Thus the first thing that must be addressed is that since Tom does not agree to that billing it is obvious that you have a very significant conflict of interest in trying to serve as his guardian. Furthermore, serving as his attorney and guardian is a conflict. Tom does not want you to be his guardian or conservator, and he wants you to quit interfering with his ability to get a driver's license.

Johnson also suggested:

> 1. That you immediately resign as his temporary guardian.
>
> 2. That you forward to my office copies of any bills that need to be paid as

well as any correspondence you have had on his [sic] these bills.

3. That you resign your position as payee of any of Tom's Social Security benefits, including the moneys [sic] previously on deposit and provide a breakdown of all checks that have been written by you since becoming a payee for any of Tom's social security monies or any other funds.

4. That if there are some potential buyers for some of Tom's equipment that you forward the information on that so Tom can consider those sales.

5. That you submit an itemized statement of any costs and attorney fees that you claim to be entitled to since the date you claim to have represented Tom, including the Social Security claim.

Please get back to me right away because if you are not willing to resign this temporary conservatorship and guardianship as I will want to have an immediate hearing before the circuit court if that is necessary.

On February 13, 2001 Johnson filed and served a motion to set aside the temporary guardianship.

[¶ 15.] Laprath continued her work on the guardianship proceedings. On February 16, 2001 Laprath, as payee, paid herself, as attorney, an additional $1,007 in attorney fees for the guardianship matter. She paid herself from Tom's money and took the money without notice to or approval of Tom or his new attorney. A document dated February 18, 2001, signed by Laprath and filed in the guardianship matter provided:

FORGIVENESS OF DEBT:

Comes now, Gwendolyn Laprath, the Good Samaritan/and One of the Petitioners herein who has given legal advice and general care to Tom J. Laprath on or before January 1, 2001 in the amount of approximately $15,000 to $20,000, no bill has been written for these services, and will not be written:

That Gwendolyn Laprath does hereby forgive all outstanding debts for attorney fees incurred by Tom J. Laprath prior to January 1, 2001. Gwendolyn Laprath does not forgive those attorney fees, costs, and caretaker/guardian fees incurred from and after January 2, 2001.

[¶ 16.] The motion to set aside the temporary guardianship was heard and granted by Circuit Judge Steven L. Zinter on February 23, 2001. Judge Zinter heard Tom's motion to dismiss the petition for guardianship and Laprath's motion for approval of attorney fees "in the amount of $3,000.00 upon the approximately $9,000.00 expended to date" on May 24, 2001. In granting the motion to dismiss, Judge Zinter found:

1. That the proceedings to secure a guardianship/conservatorship over the alleged person in need of protection, Thomas J. Laprath, were done ex parte.

2. That the guardianship/conservatorship proceedings have now been dismissed in their entirety by the Court.

3. That attorney Gwen Laprath was representing herself as well as others in the pursuit of said guardianship/conservatorship proceedings.

4. That Thomas J. Laprath did not want any guardianship or conservatorship over him and the same was done contrary to his wishes.

5. That neither this court nor any other circuit court has ever appointed the petitioner or any other person to

be the guardian or conservator for Thomas J. Laprath.

6. That the services that are the subject matter of the petitioner's present claim for attorney fee compensation were not shown to be for the benefit of Thomas J. Laprath and on their face show that some of the services being billed for were either not necessary or unreasonably incurred.

Judge Zinter concluded:

1. The court has jurisdiction over this petition.

2. That the petitioner Gwen Laprath has not shown legal cause as to why she should receive the fees requested in her petition herein.

3. The court does not consider that it has before it the issue of the repayment of any fees previously collected by Gwen Laprath.

### B.

[¶ 17.] In response to Johnson's legal representation of Tom, Laprath authored a series of letters to Johnson as well as an answer to the motion to dismiss the guardianship. She copied the letters and answer to a number of individuals who had nothing to do with the guardianship proceedings.

[¶ 18.] In a February 5, 2001 letter to a relative of Tom who was going to testify to Tom's total competency, Laprath chastised the relative for encouraging Tom to retain an attorney "that costs $500 per hour." In a February 9, 2001 letter to Johnson she wrote "you of course, will be the greedy attorney using this poor family member for his last dime at $500/hr." And, in her answer to the motion to dismiss, Laprath asserted "[f]urther that Rick Johnson has without benefit of court order required Tom J. Laprath to pay him at least the sum of $5,000 to date in attorney fees."

Johnson did not charge $500 per hour. He had not received any fees, retainer or compensation from Tom.

[¶ 19.] Laprath also authored a March 19, 2001 letter where she told Johnson to be on his "best behavior" when he deposed her or she "will walk." She offered a compromise. If Ben, Tom and Laprath's son, would agree to be Tom's sole guardian and she served as his secretary to draw and transmit checks, she wanted Johnson to "resign as Tom's attorney for 1 yr. and stop this 'targeting the messenger' because you don't have a case." She concluded by writing, "your behavior has been reprehensible in all of this and you don't need the work for George [Johnson's son who is a lawyer]. I hope you will teach George better morals than you have exhibited. A good moral attorney would have advised Tom to work with his family and get his act together as he will not improve but will continue to decline."

### C.

[¶ 20.] After reviewing Rule 8.3(a), (Reporting of Professional Conduct), and Rule 8.4, (Misconduct), of the South Dakota Rules of Professional Conduct, Johnson filed a formal complaint against Laprath with the Disciplinary Board. The complaint concerned Laprath's conduct in the guardianship proceedings as well as her mischaracterizations in her letters and answer. Johnson believed that Laprath had potentially violated SDCL 16–18–14, 16–18–16, 16–18–19 and 16–18–20 as well as Rules 1.5(a)-(b) and 8.4 of the Rules of Professional Conduct. Johnson wrote, "I believe this matter deserves the disciplinary board's consideration in order to potentially protect the public from unethical or incompetent legal services, and as a means of reinforcing that Ms. Laprath must respect and uphold the image and

integrity of the attorneys she practices with as a whole."

## II.

### WIEST COMPLAINT

[¶ 21.] The Department of Revenue periodically reviews its files to determine those license holders who have not filed or paid their sales, use or contractors' excise tax. The Department's summary of a license holder is reviewed by an attorney to determine whether there is a prima facia criminal case. If there is, the Department sends the license holder a letter giving the holder five days to return delinquent returns and/or payment. If the license holder complies, no complaint is issued at that time.

[¶ 22.] It is the practice of the Attorney General's office to forward to the State Bar of South Dakota a copy of the "five-day letter" sent to any lawyer licensed to practice law in South Dakota. It makes no difference if the attorney has come into compliance or not.

[¶ 23.] On September 28, 2001 Assistant Attorney General David D. Wiest sent a five-day letter to Laprath who had failed to file sales tax returns and timely pay the tax due for the months of May, June, July and August 2001. Laprath admits that she failed to file the sales tax returns and pay the tax owed. She, however, did not have enough money to timely pay the tax. Ultimately the tax was paid.

[¶ 24.] In addition, Laprath failed to timely file sales tax returns for January, February, May, July and November 2002. As of January 9, 2003 she owed $20.94 in unpaid sales tax.

## III.

### LEIGHTON ESTATES

[¶ 25.] On September 14, 2001 Laprath entered into a written fee agreement with Merle J. Leighton for the probate of two "estates in Todd County, and the BIA Trust Assets." The fee agreement, on a form titled "Contingent Fee Agreement," provided that Laprath would receive "$4,240.00 as an advance against anticipated expenses and attorney fees." The agreement did not state the basic fee. It did, however, give Laprath an additional eight percent fee "[i]f the real estate is sold."

[¶ 26.] To pay her fee Laprath made arrangements for Leighton to borrow $5,500 from BankWest in Gregory, South Dakota. She accompanied Leighton to the bank and co-signed the note. To secure the note Leighton mortgaged estate property. On October 12, 2001 Laprath asserted an attorney's lien against the two estates and assigned her lien to BankWest.

[¶ 27.] On October 12, 2001 Laprath received the sum of $4,240 as her retainer. She did not put it in a trust account. Rather she used it to pay her delinquent sales tax and penalty and her personal needs. At the time she spent the retainer, she had not earned the money, nor did she release her attorney's lien.

## IV.

### KAUPP GUARDIANSHIP

[¶ 28.] In March 1995 Oswald J. Kaupp retained Laprath with regard to an "arrest warrant and the writing of a 'Kaupp Trust.'" At the time she was retained Laprath advised Kaupp that he needed a guardian. Family members, however, felt a trust was more appropriate.

[¶ 29.] Despite her misgivings about Kaupp's mental capacity, Laprath drafted trust documents which Kaupp signed. Legal disagreements arose between Kaupp and Laprath and he refused to sign some documents she presented to him. As a

result she filed a petition requesting that she be appointed his guardian on July 25, 1995. The petition alleged that Kaupp was incompetent and asked that her appointment be for a "limited time during which the legal matters will be settled and the ranching operations streamlined." Laprath requested attorney fees although she had already accepted a $3,100 retainer from Kaupp.

[¶ 30.] On August 10, 1995 Kaupp discharged Laprath as his attorney. On September 6, 1995 Kaupp, represented by his court appointed attorney John Simpson, filed a motion to dismiss Laprath's petition for guardianship. He asked that the petition be dismissed "for the reason that he has discharged attorney Laprath, that prior to her discharge she took positions that were adverse to his interests and contrary to his wishes and she therefore lacked any standing as an interested party under the statute to invoke the jurisdiction of the court in these proceedings."

[¶ 31.] Laprath resisted the motion to dismiss. Following a hearing, the trial court, Judge Trandahl, entered findings of fact, conclusions of law, and an order of dismissal. The court found in part:

4.

That Attorney Laprath had disagreements with O.J. Kaupp which reflected that she had interests that were adverse to his and for that reason and because she had been terminated as his attorney she had no standing as an interested party to institute these proceedings.

5.

If a conservator is appointed herein it may become his or her duty to investigate the legal work that had been done by attorney Laprath, and for that reason she cannot act as petitioner, guardian or conservator.

6.

That the court finds that attorney Lapraths request for court approved attorney fees are without merit.

It concluded:

1.

The court concludes that Attorney Laprath is not an interested party within the meaning of SDCL 29A–5–305.

2.

The court concludes that Attorney Laprath is not entitled to attorney fees.

3.

The court concludes that Attorney Laprath lacks standing and has a conflict of interest and her petition should be dismissed.

V.

## TRUST ACCOUNTING

[¶ 32.] Laprath uses a single checking account for her personal and professional transactions. Prior to April 2001, she never maintained a trust account for the handling of client's funds. In April 2001 she did designate a savings account that she had at BankWest in Gregory, South Dakota as a trust account. Laprath uses this trust account for several purposes and commingles her own funds in the account. She makes cash withdrawals from the trust account and either purchases bank money orders or deposits the proceeds in her professional/personal checking account.

[¶ 33.] Laprath does not maintain the records required by SDCL 16–18–20.1 which provides:

Every attorney shall maintain complete records of the handling, maintenance and disposition of all funds, securities

and other properties of a client at any time in his possession, from the time of receipt to the time of final distribution, and shall preserve such records for a period of five years after final distribution of such funds, securities or other properties or any portion thereof, and failure to keep such records shall be grounds for appropriate disciplinary proceedings.

[¶ 34.] SDCL 16–18–20.2 requires the maintenance of seven minimum trust accounting records:

(1) A separate bank account or accounts and, if utilized, a separate savings and loan association account or accounts. Such accounts shall be located in South Dakota unless the client otherwise directs in writing. The account or accounts shall be in the name of the lawyer or law firm and clearly labeled and designed as a "trust account."

(2) Original or duplicate deposit slips and, in the case of currency or coin, an additional cash receipts book, clearly identifying:

(a) The date and source of all trust funds received; and

(b) The client or matter for which the funds were received.

(3) Original cancelled checks, or copies of both sides of the original checks produced through truncation or check imaging, or the equivalent, all of which must be numbered consecutively.

(4) Other documentary support for all disbursements and transfers from the trust account.

(5) A separate trust accounts receipts and disbursements journal, including columns for receipts, disbursements, transfers, and the account balance, and containing at least:

(a) The identification of the client or matter for which the funds were received, disbursed, or transferred;

(b) The date on which all trust funds were received, disbursed, or transferred;

(c) The check number for all disbursements; and

(d) The reason, such as "settlement," "closing," or "retainer," for which all trust funds were received, disbursed, or transferred.

(6) A separate file, ledger, or computer file with an individual card, page, or computer document for each client or matter, showing all individual receipts, disbursements, or transfers and any unexpended balance, and containing;

(a) The identification of the client or matter for which trust funds were received, disbursed, or transferred;

(b) The date on which all trust funds were received, disbursed, or transferred;

(c) The check number of all disbursements; and

(d) The reason, such as "settlement," "closing," or "retainer," for which all trust funds were received, disbursed, or transferred.

(7) All bank or savings and loan association statements for all trust accounts.

Laprath fails to maintain any of these minimum accounting records.

[¶ 35.] SDCL 16–18–20.2 also requires minimum trust accounting procedures:

(1) The lawyer shall cause to be made monthly:

(a) Reconciliations of all trust bank or savings and loan association accounts, disclosing the balance per bank, deposits in transit, outstanding checks identified by date and check number, and any other items necessary to reconcile the

balance per bank with the balance per the checkbook and the cash receipts and disbursements journal; and

(b) A comparison between the total of the reconciled balances of all trust accounts and the total of the trust ledger cards, pages, or computer documents, together with specific descriptions of any difference between the two totals and reasons therefor.

(2) At least annually, a detailed listing identifying the balance of the unexpended trust money held for each client or matter.

(3) The above reconciliations, comparisons, and listing shall be retained for at least six years.

(4) The lawyer shall file with the State Bar of South Dakota a trust accounting certificate showing compliance with these rules annually, which certificate shall be filed annually between December first and January thirty-first on a form approved by the Disciplinary Board.

Laprath failed to follow these minimum accounting procedures. She did, however, file with the State Bar certificates showing compliance with the trust accounting rules in 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, and 2001. The certificates were false and Laprath knew they were false.

## VI.

### COMPETENCY

[¶ 36.] In proceedings before the Referee, Circuit Court Judge Jack R. Von Wald, the Disciplinary Board subpoenaed a sitting justice of the South Dakota Supreme Court[1] and three sitting circuit court judges to testify. All had significant prior contact with Laprath in the capacity of a circuit judge. Each was asked if he or she had formed an opinion as to Laprath's competency to practice law. Judge Max A. Gors stated, "I do not believe she is competent." According to Justice Zinter, "Ms. Laprath does not meet the standards of competence of lawyers practicing in South Dakota." Judge Lori S. Wilbur testified, "My opinion is that Ms. Laprath is not competent, as I understand the Rules of Professional Conduct, to practice law; and it is a chronic problem." Judge Kathleen Trandahl testified, "[i]t is my legal opinion based upon a review of the files, having worked with Ms. Laprath over the years, that she is not competent to practice law.... She does not possess the ability to do that."

[¶ 37.] Each judge cited specific instances when Laprath's competency came into question. Records of these cases are included in the record of the proceedings before this Court and have been reviewed. They support the judges' testimony. The judges' testimony reveals common themes regarding Laprath's competency to practice law:

- Laprath does not understand how to commence an action, venue an action, give notice prior to hearing, or appeal administrative matters;
- Laprath is unable to diagnose and analyze even the most common legal problem and solve it within applicable rules;
- Laprath's written documents are error laden, poorly written, illogical or incomprehensible;
- Laprath's oral communication is poor. She fails to lay the proper foundation for evidence, objections are not made or are inappropriate, and evidence is

---

1. Although now a Justice of the South Dakota Supreme Court, Justice Zinter's testimony focused on his experiences with Laprath during the time he was a circuit court judge and not during the subsequent time he has been a Justice on this Court.

presented in a disjointed, rambling fashion; and

- Laprath is chronically late in filing documents and court appearances.

[¶ 38.]  Justice Zinter noted:

You know, she can find a statute, and she can find facts.  But to put the two together and to figure out what the legal problem really is and to solve it within the rules or procedure or evidence or whatever the applicable rules are, she just—she never gets that part of it done.

\* \* \*

I hate to say it that way, but it's just a mess from beginning to end when Ms. Laprath is involved and this case is an example of that.  You know, I really don't like saying these things because I really like Gwen as a person.  I think her heart is in the right place, and I think she tries to do the right thing, but it's almost impossible for her to get a pleading or document filed, which isn't wrong in some respect.  Whether it's a minor defect or major, it's going to have some problem with it.  And I—I fully realize—you know, we've all practiced law, and we've—everybody makes mistakes.  And I'm not talking about, you know, a mistake—I don't think anybody would—a little mistake here and there that all lawyers do, because I would never call anybody to task for something like that.  But this is a situation—like in this file when I read through it again the other day, I mean it's just every document virtually; it has problems, whether it's spelling and grammar or whether it's just incomplete sentences or failure to grasp what's going on, or not using the rules or following the rules of procedure or the rules of evidence.  It's something like that in almost everything that's filed.

DISCIPLINARY BOARD/REFEREE

[¶ 39.]  The Disciplinary Board as well as the Referee concluded:

A.  Respondent has violated SDCL 16–18–14 concerning respect for parties and witnesses.

B.  Respondent has violated SDCL 16–18–16 concerning the commencement or continuance of an action or proceeding from any motive of passion or interest.

C.  Respondent has violated SDCL 16–18–19 concerning an attorney's duty to use such means only as are consistent with truth, and never to seek to mislead the judges by any artifice or false statement of facts or law.

D.  Respondent has violated SDCL 16–18–20.1 by failure to maintain complete records of the handling, maintenance and disposition of client's funds, securities and other properties.

E.  Respondent has violated SDCL 16–18–20.2 by failure to maintain minimum trust accounting records and minimum trust accounting procedures.

F.  Respondent has violated the following rules of Professional Conduct (Rule):

(1) Rule 1.1 concerning competence;

(2) Rule 1.2 concerning scope of representation;

(3) Rule 1.5 concerning fees;

(4) Rule 1.7 concerning conflicts of interest;

(5) Rule 1.8 concerning conflicts of interest, and prohibited transactions;

(6) Rule 1.14 concerning a client under disability;

(7) Rule 1.15 concerning the safekeeping of property;

(8) Rule 1.16 concerning terminating representation;

(9) Rule 3.3 concerning candor toward the tribunal;

(10) Rule 3.4 concerning fairness to opposing parties and counsel;

(11) Rule 4.1 concerning truthfulness in statements to others;

(12) Rule 4.4 concerning respect for rights of third persons; and

(13) Rule 8.4(a)(c)(d) concerning professional misconduct.

[¶ 40.] The Disciplinary Board and the Referee conducted exhaustive hearings in this matter. Each made detailed findings of fact and conclusions of law before recommending Laprath's disbarment. Each recommended that Laprath be disbarred.

## STANDARD OF REVIEW

[¶ 41.] This Court gives careful consideration to the findings of the Disciplinary Board and Referee because they have had the advantage of encountering the witnesses first hand. *In Re Discipline of Light*, 2000 SD 100, 615 N.W.2d 164. "We do not, however, defer to a sanction recommended by the Referee." *Id.*, 2000 SD 100 at ¶ 9, 615 N.W.2d at 167. "The final determination for the appropriate discipline of a member of the State Bar rests firmly with the wisdom of this Court." *Matter of Discipline of Wehde*, 517 N.W.2d 132, 133 (S.D.1994).

## LEGAL ANALYSIS

[¶ 42.] Since the earliest days of organized government in this jurisdiction, the authority exercised by practicing attorneys has been under the supervision of its highest judicial authority. *See* ch 5, 1st Session, Laws of the Territory of Dakota, 1862. An attorney has always been viewed as possessing and exercising substantial power and authority:

A certificate of admission to the bar is a pilot's license which authorizes its possessor to assume full control of the important affairs of others and to guide and safeguard them when, without such assistance, they would be helpless. Moreover, in [South Dakota] it is a representation made by this court that he [ or she] is worthy of the unlimited confidence which clients repose in their attorneys; trustworthy to an extent that only lawyers are trusted, and fit and qualified to discharge the duties which devolve upon members of his profession.

*In re Egan*, 52 S.D. 394, 402, 218 N.W. 1, 4 (1928) (quoting *In Re Kerl*, 32 Idaho, 737, 188 P. 40 (1920)). As such, we have consistently held that the holder of a certificate to practice law from this Court holds a privilege to serve the public by the practice of law and not an absolute right:

'the right to practice law' is not in any proper sense of the word a 'right' at all, but rather a matter of license and high privilege. Certainly, it is in no sense an absolute right. It is in the nature of a franchise to the enjoyment of which no one is admitted as a matter of right, but only upon proof of fitness and *qualifications which must be maintained if the privilege is to continue in enjoyment.* (emphasis added).

*Application of Widdison*, 539 N.W.2d 671, 675 (S.D.1995) (quoting *Egan*, 52 S.D. at 398, 218 N.W. at 2–3).

[¶ 43.] Article V, section 12 of the South Dakota Constitution states that "[t]he Supreme Court by rule shall govern terms of courts, admission to the bar, and discipline of members of the bar." While this is a grant of regulatory authority to this Court, it also places an affirmative duty upon us to carry out this mandate. Moreover, this Court, in SDCL 16–19–31, has defined its constitutional regulatory relationship with the bar as:

[T]he license to practice law in this state is a continuing proclamation by the Su-

preme Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the court. It is the duty of every recipient of that privilege to conduct himself [and herself] at all times, both professionally and personally, in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law.

The purpose of disciplinary proceedings is to protect the public from fraudulent, unethical or incompetent practices by attorneys. *Matter of Discipline of Kallenberger*, 493 N.W.2d 709 (S.D.1992). They "protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession." ABA Standards for Imposing Lawyer Sanctions Rule 1.1 (1991). They are not conducted to punish the lawyer. *Petition of Pier*, 1997 SD 23, 561 N.W.2d 297.

> The preservation of trust in the legal professional is essential. *Pier*, 1997 SD 23 at ¶ 8, 561 N.W.2d at 299. Lawyers in the practice of law have a formidable responsibility to protect their clients' "property, their freedom, and at times their very lives." Matter of Chamley, 349 N.W.2d 56, 58 (S.D.1984). "Only by providing high quality lawyering can the integrity of the legal profession remain inveterate and the confidence of the public and the Bar remain strong." *Wehde*, 517 N.W.2d at 133.

In Re Discipline of Mattson, 2002 SD 112, ¶ 40, 651 N.W.2d 278, 286.

## I.

### JOHNSON COMPLAINT

#### A.

[¶ 44.] Upon receipt of Tom's lump sum benefits Laprath, as representative payee, paid herself a quarter of the benefits as attorney fees. She had no fee agreement or approval with Tom to do so and no authorization from the Social Security Administration. In the course of the next month she advanced attorneys fees to herself from Tom's benefits for a guardianship proceeding for Tom that she planned on pursuing. Tom had never asked her to be his guardian nor had he approved the attorney fees. She then, as representative payee, retained herself, as attorney, to "prosecute" a guardianship proceeding for Tom. She represented herself and her son in securing an ex parte order appointing themselves temporary guardians over Tom, who was given no notice. After Tom objected and secured his own attorney, Laprath continued to pursue the guardianship and pay herself attorney fees from Tom's benefits. She represented that she had incurred "more than $20,000" in legal fees for the guardianship. In the three month period following receipt of the $11,304 in social security benefits Laprath paid herself $4,883 in attorney fees from these benefits.

[¶ 45.] It is fundamental law that an attorney, while representing a client, must not do anything knowingly that is inconsistent with the terms of employment or contrary to the client's best interests. *Speckels v. Baldwin*, 512 N.W.2d 171 (S.D.1994). "The nature of the relationship between attorney and client is highly fiduciary. It consists of a very delicate, exacting and confidential character. It requires the highest degree of fidelity and good faith. It is a purely personal relationship, involving the highest personal trust and confidence." *Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259, 264 (S.D.1988).

[¶ 46.] In her dealings with Tom, Laprath violated her fiduciary obligation. As

an attorney Laprath had a duty "not to encourage either the commencement or continuation of an action or proceeding from any motive of passion or interest." SDCL 16–18–16. Here, Laprath charged exorbitant attorney fees without a fee agreement with Tom for work he did not authorize. She paid herself fees before services were rendered. She depleted his social security benefits by almost half in three months to pay herself for work that a court found did not benefit Tom, was not necessary, and was unreasonable. She failed to recognize any conflict between her serving as Tom's representative payee, Tom's attorney, attorney for herself and her son seeking guardianship, and as Tom's temporary guardian. And, she continued to pursue the guardianship and pay herself attorney fees from Tom's benefits after Tom terminated the attorney-client relationship and hired another attorney to represent him in resisting the guardianship.

[¶ 47.] At a minimum Laprath's actions in this matter violated Rules 1.2 (Scope of Representation), 1.5 (Fees), 1.7 and 1.8 (Conflict of Interest), and 1.14 (Client Under a Disability).

[¶ 48.] Laprath contends, however, that all of her actions as representative payee and attorney were discretionary and therefore shield her from discipline. Laprath believes that the Preamble to the Rules of Professional Conduct as well as Rule 1.14 (Client Under a Disability) and its comment support her contention.

[¶ 49.] The Preamble to the Rules of Professional Conduct provides, in part:

> The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal presentation and of the law itself. Some of the Rules are imperatives, cast in the terms of "shall" or "shall not". These define proper conduct for pur-

poses of professional discipline. Others, generally cast in the term "may", are permissive and define areas under the Rules in which the lawyer has professional discretion. *No disciplinary action should be taken when the lawyer chooses not to act or acts within the bounds of such discretion.* Other Rules define the nature of relationships between the lawyer and others. The Rules are thus partly obligatory and disciplinary and partly constitutive and descriptive in that they define a lawyer's professional role.

(emphasis supplied).

Rule 1.14 provides:

> (a) When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.
>
> (b) A lawyer may seek the appointment of a guardian or take other protective action with respect to a client, only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest.

[¶ 50.] The comment to Rule 1.14 provides, in part:

> If a legal representative has already been appointed for the client, a lawyer should ordinarily look to the representative for decisions on behalf of the client. If a legal representative has not been appointed, the lawyer should see to such an appointment where it could serve the client's best interests. Thus, if a disabled client has substantial property that should be sold for the client's benefit, effective completion of the transaction ordinarily requires appointment of a legal representative. In many circum-

stances, however, appointment of a legal representative may be expensive or traumatic for the client. Evaluation of these considerations is a matter of professional judgment on the lawyer's part.

In her brief to the Referee, Laprath indicated that the final sentence in the quoted comment paragraph was followed by the sentence, "This evaluation is discretionary and not subject to review by the Disciplinary Board, or the Court." No such sentence exists in the comment to Rule 1.14.

[¶ 51.] Because Rule 1.14(b) says that a lawyer "may" seek appointment of a guardian under certain circumstances, Laprath believes her action in seeking her and her son's appointment as guardian and all of her actions with regard to the guardianship are discretionary and not subject to discipline. Laprath misinterprets Rule 1.14, however. The ABA Committee on Ethics and Professional Responsibility explains:

Rule 1.14(b) creates a narrow exception to the normal responsibilities of a lawyer to his client, in permitting the lawyer to take action that by its very nature must be regarded as "adverse" to the client. However, Rule 1.14 does not otherwise derogate from the lawyer's responsibilities to his client and certainly does not abrogate the lawyer-client relationship. In particular, it does not authorize a lawyer to represent a third party in seeking to have a court appoint a guardian for his client. Such a representation would necessarily have to be regarded as "adverse" to the client and prohibited by Rule 1.7(a), even if the lawyer sincerely and reasonably believes that such representation would be in the client's best interests, unless and until the court makes the necessary determination of incompetence. Even if the court's eventual determination of incompetence would moot the argument that the rep-

resentation was prohibited by Rule 1.7(a), the lawyer cannot proceed on the assumption that the court will make such a determination. In short, if the lawyer decides to file a guardianship petition, it must be on his own authority under Rule 1.14 and not on behalf of a third party, however well-intentioned.

\* \* \*

Seeking the appointment of a guardian for a client is to be distinguished from seeking to be the guardian, and the Committee cautions that a lawyer who files a guardianship petition under Rule 1.14(b) should not act as or seek to have himself appointed guardian except in the most exigent of circumstances, that is, where immediate and irreparable harm will result from the slightest delay. Even in the latter situations, a lawyer may have to act before the appointment has been actually made by a court. A lawyer whose incapacitated client is about to be evicted, for instance, should be permitted to take action on behalf of the client to forestall or prevent the eviction, for example, by filing an answer to the eviction complaint. In such a case the lawyer should take appropriate steps for the appointment of a formal guardian, other than himself, as soon as possible.

ABA Com. On Ethics and Professional Responsibility, *Client Under a Disability*, Formal Op 96–404.

### B.

[¶ 52.] In her letters to Johnson and others and her answer to the motion to dismiss, all of which were copied to individuals having nothing to do with the guardianship, Laprath asserted that Johnson charged $500 per hour and has been paid $5,000 in attorney fees by Tom. Neither accusation was true and Laprath ad-

mitted that she had nothing to back them up. By doing so, Laprath failed in her duty as an attorney "to employ, for the purpose of maintaining the causes confided to [her], such means only as are consistent with truth[.]" SDCL 16–18–19.

[¶ 53.] In addition to providing knowingly false information, Laprath's letters contain inflammatory statements that are personally and professionally offensive. She violated her duty and her oath to "abstain from all offensive personality." SDCL 16–16–18. This is an on-going obligation, a lawyer's duty under SDCL 16–18–14, and a lawyer's responsibility to use the law's procedures only for legitimate purposes and not to harass or intimidate others. *In re Discipline of Eicher*, 2003 SD 40, 661 N.W.2d 354.

[¶ 54.] In fairness to Laprath she did attempt to write to Johnson and apologize. The letter provided: [2]

November 7, 2001

Rick Johnson

Johnson, Eklund, Nicholson, and Peterson

P.O. Box 149

Gregory, SD 57533

RE: letter of apology re In the Matter of Tom J. Laprath Tripp County

Dear Ms. Laprath: [sic]

I deeply regret the non-professional attitude I adopted and used in my correspondence to you regarding the guardianship of Tom J. Laprath. It was unprofessional and well beneath my usual standard of behavior. It will not occur again. Please accept my heartfelt apology.

Best regards,

/s/_____

Gwendolyn Laprath

### C.

[¶ 55.] At various points in these proceedings Laprath has charged that Johnson's complaint to the Disciplinary Board was part of a scheme by Johnson to harass her and to cause economic harm and emotional distress to her. She believes that the matters he complained about are inconsequential.

[¶ 56.] Other than her allegation, Laprath provided no evidence to support her claim. Indeed, Johnson had a duty to report professional misconduct. Rule 8.3(a) provides that "[a] lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority."

[¶ 57.] Laprath has also contended that she did not receive due process at the Disciplinary Board hearing because board member Gregory Eiesland and Rick Johnson were partners, with twenty others, in a limited partnership that owns land for hunting purposes. She also questioned whether she received a fair hearing due to her belief that three members of the board were unfamiliar with social security and guardianship laws. Laprath filed a motion to dismiss the disciplinary action. The matter was fully briefed. The Referee recommended that the motion be denied. This Court considered her motion, briefs, recommendation and denied the motion to dismiss on October 17, 2002. There is no evidentiary basis to support her charges. This point was not lost on the Referee as

---

**2.** Although the address and the contents of the letter clearly indicate it was intended to be a letter of apology from Laprath to Johnson, the letter inexplicably opens with Laprath addressing the apology to herself rather than Johnson.

he found "[Laprath] tends to blame others, including judges, clients, and other lawyers for her lack of competence." As in previous disciplinary cases, we do not condone baseless attacks on the integrity of members of the judiciary, Disciplinary Board or members of the bar simply because they are doing their duty in matters of attorney discipline. *Matter of Dorothy*, 2000 SD 23, ¶¶ 42–48, 605 N.W.2d 493, 505–8; *Eicher*, 2003 SD 40, ¶ 35, n.6, 661 N.W.2d at 363, n.6.

## II.

### WIEST COMPLAINT

[¶ 58.] Laprath admits that she failed to file sales tax returns and timely pay the tax due for the months of May, June, July and August 2001. The failure to pay sales tax within thirty days from the date due constitutes a Class 1 misdemeanor. SDCL 10–45–48.1(2). The failure to file a sales tax return within thirty days from the date of return is due is also a Class 1 misdemeanor. SDCL 10–45–48.1(4). The violation of SDCL 10–45–48.1(2) or SDCL 10–45–48.1(4) two or more times in any twelve-month period is a Class 6 felony. SDCL 10–45–48.1(6).

[¶ 59.] Consequently, Laprath was facing two Class 6 felonies for her failure to file the sales tax returns and pay the tax owed. It was only because she complied with the Department of Revenue's demand for return of the delinquent returns and payment of the tax within the allotted time that the Department decided not to pursue a criminal prosecution.

[¶ 60.] According to Laprath, her repeated failure to file tax returns and pay the tax in a timely manner was due to her surgery, a lack of funds, and "the need to file and maintain a lawsuit for the guardianship of Tom J. Laprath." Nevertheless, this Court has noted, that "[f]inancial problems, however, do not excuse nor do they justify a course of conduct in the handling of a client's funds that leads to the misallocation or withholding, however temporary, of such funds." *In re Rude*, 88 S.D. 416, 221 N.W.2d 43, 47–48 (1974). In addition, if her health problems were so disabling, she had the duty to secure other counsel to properly handle her client's affairs. *Matter of Discipline of Stanton*, 446 N.W.2d 33 (S.D.1989).

[¶ 61.] Laprath also believes that she cannot be disciplined for her failure to file returns and taxes because she was not criminally prosecuted for that failure. Laprath misunderstands the purpose of attorney discipline. It is for the protection of the public, not the punishment of the offender. The Department's decision not to pursue a criminal prosecution has nothing to do with this Court's "inherent power to supervise the conduct of attorneys who are its officers." SDCL 16–19–20. This Court, and not criminal prosecutors, or some other third party, is solely entrusted with attorney discipline. *Cf Eicher*, 2003 SD 40, ¶ 27, 661 N.W.2d at 370; *Mattson*, 2002 SD 112, ¶ 51, 651 N.W.2d at 288.

[¶ 62.] Sales tax is money held in trust for the state. *Kallenberger*, 493 N.W.2d at 711. "[T]ax defalcation ... borders on embezzlement of funds received from clients in payment of sales tax, which monies [an attorney], in effect, holds in trust for remittance to the State." *In re Discipline of Crabb*, 416 N.W.2d 258, 260 (S.D.1987).

While each individual sales tax delinquency may appear at first glance a minor violation, this court must look at the entire picture. "A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation." SDCL ch 16–18, Appx Rule 8.4

Comment. Therefore this court holds that Kellenberger's conduct indicated an indifference to legal and financial obligations[.]

*Kallenberger*, 493 N.W.2d at 712.

## III.

### LEIGHTON ESTATES

[¶ 63.] In this matter Laprath used her client to enter a transaction that benefited herself. She took her client to the bank to borrow money, had the client mortgage estate property, and had the borrowed funds paid to herself so she could pay her sales tax arrears. She co-signed the note, filed an attorney's lien against the estate, and assigned her lien to the bank. She does not dispute that she knowingly took the money before performing the services she agreed to perform. Her actions, at a minimum, violated Rule 1.5 (Fees) and Rules 1.7 and 1.8 (Conflicts of Interest).

## IV.

### KAUPP GUARDIANSHIP

[¶ 64.] In this matter Laprath drafted documents for and had them signed by a client that she considered incompetent. She took positions adverse to her client's interests and contrary to his wishes. When he objected, she alleged that he was incompetent and filed a petition requesting that she be appointed his guardian. She believed that Rule 1.14 (Client under a Disability) mandated her to seek her own appointment, something the rule clearly does not require. *See* ABA Formal Op 96–404, *supra* at ¶ 51. Her client, who had not given his consent to her filing the petition, discharged her. When his court appointed attorney filed a motion to dismiss Laprath's petition, she resisted.

[¶ 65.] Laprath's actions, at a minimum, violated Rules 1.2 (Scope of Representation), 1.7 and 1.8 (Conflict of Interest), and 1.14 (Client Under a Disability).

## V.

### TRUST ACCOUNTING

[¶ 66.] Laprath admits that she did not maintain a client trust account prior to April 2001. The trust and financial records she has maintained since then are "so incomplete and confusing that one would have to be a Houdini to interpret [her] records." *In re Discipline of Mines*, 2000 SD 89 at ¶ 22, 612 N.W.2d 619, at 628. She maintains none of the minimum trust accounting records required by and clearly set forth in SDCL 16–18–20.2. She fails to follow the mandatory minimum trust accounting procedures required by SDCL 16–18–20.2. She knowingly filed false compliance certificates with the State Bar for nine years.

[¶ 67.] Like Mines, Laprath has "deplorable" office and financial practices. *Mines*, 2000 SD 89 at ¶ 22, 612 N.W.2d at 628. Her failure to follow the mandates of SDCL 16–18–20.2, the fact that her "trust account" is subject to overdrafts, her knowing failure to keep client funds and property separate from her own, her participation in setting up loans for clients to pay her fees, her habit of taking and keeping money for fees before she has earned them, and her failure to timely file returns and pay her sales tax is substantial professional misconduct in violation of Rule 8.4.

## VI.

### COMPETENCY

[¶ 68.] The first rule of the Rules of Professional Conduct declares: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge,

skill, thoroughness and preparation reasonably necessary for the representation."[3] This Court takes its obligation to assure the public of the competency of the bar most seriously:

> With the authority to license, suspend, disbar, and reinstate lawyers comes the awesome responsibility to the public of this state to assure, to the best of our ability, that lawyers have basic competence to advise and represent their clients. We intend to respond to that responsibility in a serious, conscientious manner.

*Matter of Voorhees*, 403 N.W.2d 738, 739 (S.D.1987). Laprath disputes the Referee's findings of lack of her competence based upon a challenge to the judges who testified against her.

[¶ 69.] At the hearing before the Referee, four judges that Laprath frequently appeared before were subpoenaed to testify. Laprath objected based upon *Appeal of Schramm*, 414 N.W.2d 31 (S.D. 1987) which she claimed stood for the proposition that "an expert must testify as to the competency of the person being licensed ... and that other fellow practitioners of the same education and experience are not qualified as experts to testify." She also contends that she has far more experience in the law than Judges Wilbur and Trandahl so their opinions are suspect and unreliable. Contrary to the allegation of Laprath against Judges Wilbur and Trandahl, mere length of time one is a member of the Bar does not equate with superior professional skills and competence. She contends that Justice Zinter recanted his opinion that she was incompetent, which he did not. She believes her appearances before Judge Gors were too remote to form a basis for an opinion of incompetency. They are not.

[¶ 70.] Laprath has misinterpreted this Court's opinion in *Schramm*. In that case, this Court adopted the rationale of the majority of jurisdictions and held that where issues of competence and negligence are of a complicated nature, expert testimony is required in administrative hearings to establish the proper competency

---

3. The comment to this rule provides a more detailed description of competency:

> In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances.
>
> A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience. Some important legal skills, such as the analysis of precedent, the evalu-

ation of evidence and legal drafting, are required in all legal problems. Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge. A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question.

> \* \* \*
>
> Competent handling of a particular matter includes inquiry into an analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequence.

standards and whether they are met. The Court noted:

> The adoption of such a requirement should impose no great hardship on the Board nor interfere with its obligation to protect the public. At the hearing, the Board subpoenaed two dentists who practiced in the same town as appellant and another who practiced in a similar locale, all of whom have seen numerous examples of appellant's professional work. It would have been very simple to have asked these expert witnesses as to the standard of competency for dentists in the Winner area and similar locales and whether the examples of appellant's work they saw met the standard.

*Schramm*, 414 N.W.2d at 37, fn. 9. The Court's holding was limited to standards for dentists, but applied to licensing boards and decisions that would ultimately be reviewed by the courts under SDCL ch 1–26. The reason for this rationale is that the jurists, who ultimately decide the case based on the administrative records, have no expertise in dentistry. There was no competent way for this Court to review the literally hundreds of x-rays and plaster casts of teeth prepared by Schramm to determine his competency absent expert testimony from experts in the field of dentistry.

[¶ 71.] The same is not applicable in attorney disciplinary cases. All four judges who testified in this case, members of the Disciplinary Board, the Referee and members of this Court are veteran members of the bar. Judges in other contexts are routinely called upon to make determinations as to attorney competence in a particular matter. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (professional competence in criminal defense matters); *Keegan v. First Bank of Sioux Falls*, 519 N.W.2d 607 (S.D.1994) (attorney malpractice).

[¶ 72.] The Supreme Court has the inherent power to supervise the conduct of attorneys who are its officers. SDCL 16–19–20. Bar discipline is an administrative process under the authority of the justices of this Court. SDCL ch 16–19. *See Matter of Eisenhauer*, 426 Mass. 448, 689 N.E.2d 783 (1998). Here the four judges testified before this Court's appointed Referee.

[¶ 73.] As a trial judge, each had the unique "opportunity to observe and evaluate the character, competence, industry and fidelity of the lawyers who regularly appear before him [or her] day in and day out." State ex rel. *Lawrence v. Henderson*, 1 Tenn.Crim.App. 199, 433 S.W.2d 96 (1968). As a trial judge, each also has disciplinary responsibilities including:

> A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Code of Professional Responsibility should take appropriate action. A judge having knowledge that a lawyer has committed a violation of the Code of Professional Responsibility that raises a substantial question as to the lawyer's honesty, trustworthiness or
>
> fitness as a lawyer in other respects shall inform the appropriate authority.

Canon 3(D)(2) Code of Judicial Conduct. *See Eicher*, 2003 SD 40 at ¶ 49–50, 661 N.W.2d at 369–370.

> Because of their critical position in the judicial bureaucracy, judges are required to insure that the integrity of the judicial system is preserved and maintained. Among the administrative responsibilities imposed on a judge in Canon 3, therefore, is that of taking or initiating appropriate disciplinary mea-

sures against a judge or lawyer for unprofessional conduct of which the judge may become aware. Thus, a judge exposes himself or herself to the disciplinary action for failure to report the misconduct of other judges or attorneys to attorney disciplinary bodies and judicial conduct commissions.

Judicial conduct commissions are adjuncts of the modern judicial bureaucracy and, as such, judges are required to comply with directives of these bodies and fully cooperate with them in matters involving the legitimate exercise of their disciplinary function.

Jeffrey M. Shaman, et al, Judicial Conduct and Ethics § 6.15 (3d ed 2000).

■■■■ [¶ 74.] The Referee entered sixty-six findings of fact and concluded that Laprath had violated five statutes and thirteen Rules of Professional Conduct. The Referee concluded that Laprath violated Rule 1.1 which provides:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

"[T]he enforcement of competent standards has been generally limited to relatively exotic, blatant, or repeated cases of lawyer bungling." C. Wolfram, Modern Legal Ethics § 5.1 (1986). The record in this case clearly demonstrates a blatant and repeated case of lawyer bungling demonstrating "a continuing pattern of gross incompetence." *Matter of Disciplinary Action Against Nassif*, 547 N.W.2d 541, 543 (N.D.1996).

[¶ 75.] A myriad of examples of incompetence have already been set forth in this opinion. We also note that this Court found Laprath's representation deficient in several respects in *Freeman v. Leapley*, 519 N.W.2d 615 (S.D.1994). The Federal District Court as well as the Eighth Circuit Court of Appeals held that Laprath's assistance was ineffective and prejudiced the defendant. *Freeman v. Class*, 911 F.Supp. 402 (D.S.D. 1995); *Freeman v. Class*, 95 F.3d 639 (8th Cir.1996).

[¶ 76.] Finally, we can not overlook Laprath's lack of competence in the presentation of her defense in this disciplinary proceeding. In addition to misrepresenting key facts and law, she has demonstrated her lack of understanding of the most fundamental legal doctrines and rules of procedure.

## APPROPRIATE DISCIPLINE

■■■■ [¶ 77.] "Appropriate discipline in any given case necessarily depends upon the seriousness of the misconduct by the attorney and the likelihood of repeated instances of similar misconduct." *Matter of Discipline of Martin*, 506 N.W.2d 101, 105 (S.D.1993). We also consider the prior record of the attorney. *Matter of Bihlmeyer*, 515 N.W.2d 236 (S.D.1994).

■■■■ [¶ 78.] The level of professional competence that one must possess to be granted the privilege to practice law in this state has its basis in the recognition of its goal-to "assume . . . control of the important affairs of others and to guide and safeguard them when, without such assistance, they would be helpless." *Egan*, 52 S.D. at 402, 218 N.W. at 4. A law school graduate will not ordinarily immediately possess the same skills as those of a veteran trial attorney. Any lawyer may be presented with a client seeking assistance over a legal problem with which the lawyer is unfamiliar. Obviously, a trip to the law books will be necessary to bring the attorney up to a level of competence to assist the client. Moreover, we recognize that human frailty being what it is, mistakes may happen where the competent attorney

simply commits an act of malpractice. While this individual act may subject the attorney to respond in monetary damages, it is not the basis for removal from the bar.

[¶ 79.] However, there exists a fundamental level of competence which an attorney must possess. This is not permanently achieved with graduation and admission to the bar. It is a continual and on-going obligation. " 'Each day of an attorney's [professional] life demands that these requirements be met anew.' " *Eicher*, 2003 SD 40, ¶ 25, 661 N.W.2d at 363. As noted, it might be that the attorney is being presented with a request for assistance by a client which will require the attorney to educate himself or herself on the law in that particular area or refer the matter to another attorney who is familiar with that area of the law. If, however, after many years of practice, the attorney habitually, because of lack of ability, fails to improve his or her level of expertise to that of a competent attorney, and based on this past record, gives no indication that he or she is willing, and/or capable of rising to that minimum competency level, it becomes the duty of this Court to act for the protection of the public.

[¶ 80.] The extent of Laprath's incompetence and misconduct disclosed in the records of this proceeding is overwhelming. It is pervasive throughout every aspect of her practice. She does not manage her office adequately. She does not comply with the rules governing trust accounts. She does not honor the obligations of a fiduciary. She does not represent her clients competently and does not separate her own interests from those of her clients. She does not know or understand the substantive or procedural law. She does not understand the Rules of Professional Conduct. She refuses to take responsibility for her own actions and

makes excuses or places the blame on someone else. She has failed to rectify her failure or correct her misconduct and has not demonstrated an ability to do so.

[¶ 81.] Laprath's conduct "as evidenced in this record and [her] prior disciplinary history, demonstrates a clear, continuing pattern of gross incompetence, unacceptable office practices, inadequate record keeping, and mishandling ... of client funds." *Nassif*, 547 N.W.2d at 544.

[¶ 82.] We have had professional violations before us in the past although not to the numerical extent we have here. However, in previous cases, the violations were intentional acts. While in a few instances, rational judgment may have been diminished to a point by alcohol or narcotic drugs, no one questioned the attorneys' underlying competence or capability to comply with the rules. Here, however, we have an attorney who in the view of four judges before whom she has frequently appeared, the Disciplinary Board and this Court's Referee, does not possess the minimal professional skills to comprehend the nature of the rules or how to comply with them.

[¶ 83.] It is not just the lack of competency in her legal work that is of concern. Laprath's inability to comprehend the professional rules as to when she is entitled to other people's money for fees for legal work competently done, is most troubling. It is clear that this inability on both counts presents a danger to the public in the future.

[¶ 84.] In appearance before this Court, Laprath refused to accept responsibility for her acts and errors. She claimed she was being subject to unfair treatment because she was a female attorney and because she was a rural solo practitioner. There is nothing in the record to support either allegation. This type of blaming

others mentality has been repeatedly rejected by this Court as an acceptable justification for unprofessional misconduct. *Widdison,* 539 N.W.2d at 678, *Eicher,* 2003 SD 40 at ¶ 52, 661 N.W.2d at 370.

[¶ 85.] It is clear she is unrepentant and refuses to acknowledge or admit her misconduct. We have held that such an attitude merits our "serious consideration" in determining an appropriate discipline to protect the public. *Dorothy,* 2000 SD 23 at ¶ 41, 605 N.W.2d at 505. Moreover, she does not present any type of plan to remedy the situation.

[¶ 86.] The counsel for the Disciplinary Board pointed out in oral argument that none of the mitigating factors adopted by the American Bar Association are applicable here. We agree.[4]

[¶ 87.] Thus, we are left with the question: does Laprath's lack of competence somehow excuse her conduct? As the purpose of attorney discipline is to protect the public and not punish the intentional violator, the obvious conclusion is that ignorance of the law and professional rules or the lack of professional competence is no excuse for her conduct. The alcoholic may achieve sobriety, the drug addict-abstinence, the embezzler-newfound honesty. Thus, they are capable of rehabilitation.

"History is replete with those who have overcome a weakness or character flaw and risen to what Attorney at Law Abraham Lincoln declared to be the 'better angels of our nature.'" *Eicher,* 2003 SD 40, ¶ 29, 661 N.W.2d at 371. However, here all credible evidence points to the fact Laprath has not possessed the skills of a competent lawyer.

[¶ 88.] Disbarment is generally appropriate when a lawyer's "course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client." Rule 4.51, ABA Standards for Imposing Lawyer Sanctions. Disbarment "should be imposed on lawyers whose course of conduct demonstrates that they cannot or will not master the knowledge and skills necessary for minimally competent practice." Commentary, Rule 4.51. There is no option but to disbar Laprath.

[¶ 89.] Therefore, we order:

(1) Effective immediately, a judgment shall be entered disbarring Laprath, and striking her name from the Clerk's roll of attorneys;

(2) Laprath shall immediately comply with the provisions of SDCL 16–19–

---

4. "Although we have not adopted the ABA Standards for Imposing Lawyer Sanctions, and are not adopting them here, for guidance we do consider the Standards." *Light,* 2000 SD 100 at ¶ 13, 615 N.W.2d at 168.

Rule 9.2 of the ABA Standards for Imposing Lawyer Sanctions identifies ten factors that may be considered in aggravation. Seven are applicable here: (1) prior disciplinary offenses; (2) dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple offenses; (5) refusal to acknowledge wrongful nature of conduct, (6) vulnerability of victim, and (7) substantial experience in the practice of law.

Rule 9.3 of the ABA Standards for Imposing Lawyer Sanctions identifies thirteen

mitigating factors, none of which are applicable here. They are:
(1) absence of a prior disciplinary record;
(2) absence of a dishonest or selfish motive;
(3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

78 through 81 inclusive and return all files and documents to her clients.

[¶ 90.]  SABERS, KONENKAMP and MEIERHENRY, Justices, and MILLER, Retired Justice, concur.

[¶ 91.]  MILLER, Retired Justice, acting by appointment, sitting for ZINTER, Justice, disqualified.