#29156-DG
**2020 S.D. 7**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE DISCIPLINE OF
SCOTT R. SWIER
AS AN ATTORNEY AT LAW

* * * *

ORIGINAL PROCEEDING

* * * *

ROBERT B. FRIEBERG
THOMAS H. FRIEBERG of
State Bar of South Dakota
Beresford, South Dakota                    Attorneys for Disciplinary
                                           Board.


JEFFERY G. HURD of
Bangs, McCullen, Butler,
    Foye & Simmons, LLP
Rapid City, South Dakota                   Attorneys for respondent.

* * * *

ARGUED
JANUARY 15, 2020
OPINION FILED **02/19/20**

#29156

GILBERTSON, Chief Justice

[¶1.]    Following duly noticed hearings on June 17, 2019, and September 12,

2019, the Disciplinary Board filed findings of fact, conclusions of law, and a

recommendation that attorney Scott R. Swier be publicly censured for violating

Rule 1.9 (a) (Duties to Former Clients),[1] Rule 5.1 (Responsibilities of Partners,

Managers, and Supervisory Lawyers),[2] and Rule 8.4 (a) and (d) (Misconduct),[3] of the

---

1.    Rule 1.9 (a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

2.    Rule 5.1 provides:

> (a) A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the rules of professional conduct.
> (b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the rules of professional conduct.
> (c) A lawyer shall be responsible for another lawyer's violation of the rules of professional conduct if:
>> (1) The lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or
>> (2) The lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

3.    Rules 8.4 (a) and (d) provide:

> It is professional misconduct for a lawyer to:

(continued . . .)

South Dakota Rules of Professional Conduct, SDCL ch. 16-18 app. This filing with the Supreme Court constitutes a formal accusation against Swier. SDCL 16-19-67(1). Swier admitted the allegations in the formal accusation. SDCL 16-19-67(3). Pursuant to its inherent authority to supervise and, where necessary, discipline attorneys, this Court conducted a hearing and now concludes that the appropriate sanction is a one-year suspension from the practice of law. SDCL 16-19-20; SDCL 16-19-21; SDCL 16-19-35(2).

## BACKGROUND

[¶2.] Swier graduated from the University of South Dakota School of Law in 1997, passed the bar examination, and was admitted to practice law on January 2, 1998. He clerked for the Seventh Circuit for one year, was in private practice for seven years, and served as an assistant attorney general for three years. He purchased Tom Alberts' law practice in Avon, South Dakota, and re-entered private practice in 2011.

[¶3.] At the time of the June 17, 2019, hearing in this matter, Swier Law Firm had offices in Avon, Sioux Falls, Corsica, Winner, and White Lake. The firm was in the process of opening an office in Wagner and had an office in Sturgis affiliated with a Sturgis law firm. The firm has an online presence that generates

_____

(. . . continued)

      (a) Violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

              * * *

      (d) Engage in conduct that is prejudicial to the administration of justice[.]

#29156

both client leads and interest from attorneys seeking employment with the firm. It also has a business relationship with Hoy Law. Hoy Trial Lawyers Prof. LLC, https://hoylaw.com/swier-law-/-hoy-law.html (last visited February 17, 2020).

[¶4.]	Swier is the CEO of Swier Law Firm, Prof. LLC, and is primarily responsible for the management of the firm. For the majority of its existence, Swier was its sole shareholder. Swier makes all decisions regarding billing the firm's clients after attorney employees submit timesheets to him and the firm's finance director. The firm has employed up to eleven attorneys. As employees, each attorney has an individual guaranteed base salary. There is also an incentive bonus structure that is paid on a quarterly basis. Depending on their experience with the firm, attorneys receive a bonus on the net revenue they bring into the firm. Christmas bonuses depend on how the firm is doing financially and are at Swier's discretion.

[¶5.]	A financial planner valued the Swier Law Firm at between four to four-and-a-half million dollars based on gross revenues, net revenues, and its online presence. Swier is now a 95 percent shareholder in the firm, and his attorney sister is a 5 percent shareholder. Swier has also started to offer his attorney employees a "one one-hundredth of a percent of ownership in the firm" in order to have them feel invested in the firm. According to Swier, one attorney who became a shareholder

under this arrangement and left the firm was entitled to $400 as the attorney's share.[4]

[¶6.] In the eight years that the firm has existed, six attorneys have left Swier Law Firm. There are currently two attorneys (Swier and his sister) in the Avon office, one attorney in Winner, and two attorneys in Sioux Falls. Jake Fischer, an attorney who left and returned to Minneapolis has, according to Swier, "kind of like an of counsel relationship" with Swier Law, and an estate and business attorney works from Germany where her husband is in the military. Swier travels to the Sioux Falls office weekly and the Winner office monthly. He visits other offices on an as-needed basis. His contact with firm attorneys is also via teleconference, Skype, or GoToMeeting. As for Swier's personal caseload, 95 percent of his practice is representing schools throughout the state. He also does some business litigation. He normally charges schools $275 per hour.

[¶7.] While Swier has no prior history with the Disciplinary Board, in a recently reported case in the North Western Reporter, the Swier Law Firm and an attorney in the firm were disqualified in a case by court order for violating the Rules of Professional Conduct on conflicts of interest. *See Berggren v. Schonebaum*, 2017 S.D. 89, 905 N.W.2d 563. In *Berggren*, in 2014, John Berggren, the buyer of a stud horse, sued Jeff Schonebaum, the seller of the horse, claiming Schonebaum misrepresented the horse's ability to breed. Jake Fischer of Swier Law Firm, and

---

4. The termination of employment, the amount owed in bonuses, and the amount and percentage of ownership is disputed by this attorney who claims Swier gave her 1 percent, not one one-hundredth, and owes her $100,000.

Swier himself, appeared in the action on behalf of Berggren. Sometime later that year, Lawrence Meendering, who loaned Schonebaum the money to initially buy the horse, met with Fischer because of his concern that Schonebaum would not repay the loan and other personal loans. Fischer did not disclose that he represented Berggren. Ultimately, the Berggren complaint was amended to include Meendering as a defendant, alleging that he was jointly liable for Schonebaum's conduct.

[¶8.] Meendering filed a motion seeking Fischer's disqualification for violating Rule 1.18(b) and (c) of the Rules of Professional Conduct which provide, in part, that an attorney shall not use or reveal information learned in consultation with a prospective client and:

> shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter[.]

Rule 1.18(c). Meendering also filed a motion to disqualify Swier Law Firm under Rule 1.10, which generally provides that an attorney's conflicts of interest are imputed to all other members of the attorney's firm.

[¶9.] The circuit court granted the motion to disqualify Fischer and the Swier Law Firm. There was no appeal from the order disqualifying Fischer and the Swier Law Firm from the case. Fischer did appeal from the circuit court's order awarding attorney's fees. Fischer, along with Swier and Michael Henderson of Swier Law Firm, represented Fischer on appeal.

## THEELER COMPLAINT

[¶10.]     Pursuant to Rule 8.3 (Reporting Professional Misconduct) of the South Dakota Rules of Professional Conduct, attorneys Jack Theeler and Richard J. Rylance of Morgan Theeler LLP filed a disciplinary complaint regarding Swier's, Lindsay Harris', and Michael Henderson's representation of Shirley A. Hickey.

[¶11.]     A history of the Hickey family is necessary to understand the dynamics of this disciplinary complaint.  Shirley and Cliff Hickey married in 1956 and over the course of the next twenty years had eight children.  They operated a residential and commercial contracting business, Cliff Hickey Construction (CHC), and a lumberyard in Chamberlain.  They employed three of their sons in these successful businesses.

[¶12.]     Warren Hickey is Shirley and Cliff's sixth child.  Beginning in 1988, CHC subcontracted HVAC work to Warren's heating and cooling business.  The expenses and profits of that business were paid from and deposited into CHC's account.  Warren and Shirley kept track of what CHC owed Warren.  This business arrangement—as well as the fact that Warren lived with his parents until his early thirties, then bought the house next door to Shirley from Shirley and lived in it, and was deeded land by Shirley in 2016—created animosity and tension between the sons Shirley and Cliff employed, as well as the other siblings.

[¶13.]     Cliff died in 2007.  One son purchased the lumberyard while another purchased CHC's assets.  Shirley relied on Warren to maintain her properties.  Shirley and Warren agreed that they would document Warren's expenses and that he would be paid sometime later.

[¶14.] In March 2010, Shirley retained the late Carolyn A. Thompson of Thompson Law, P.C. in Sioux Falls to draft the Shirley A. Hickey Living Trust. Shirley's youngest children, Kristina Lippert, a full-time mom, and Darren, a Chamberlain funeral director, were named successor co-trustees. If Kristina or Darren were unable or unwilling to serve, the trust named Warren to serve with the remaining successor co-trustee. The trust treated all of Shirley's children equally regarding distribution.

[¶15.] In 2012, Shirley was diagnosed with Parkinson's Disease. Shirley believed that she needed to get her financial affairs in order. She and her sister, Ann, reviewed years of records to determine what she owed Warren. It took two years to determine the amount owed.

[¶16.] In November 2015, Shirley asked Thompson Law to draft a promissory note in favor of Warren. The work was assigned to attorney Lindsay Harris who was admitted to the bar in 2012. Harris drafted the promissory note and witnessed Shirley execute it on November 10, 2015. The promissory note provided that Shirley, as trustee, or her successors under the Shirley A. Hickey Living Trust, promised to pay Warren $4,000,000 with interest at an initial rate per annum equal to the federal short-term rate.[5] Harris was not involved in ascertaining the merits of the $4,000,000 amount. Kristina was present when her mother signed the note and had no objection to its purpose or amount.

---

5.  This second promissory note was intended to supersede a prior note dated June 30, 2015. The first note did not include the trust as an obligor.

[¶17.] Harris worked with Carolyn Thompson and another associate on matters pertaining to Shirley's life and eventually took over the file for Thompson Law. In September 2016, Shirley and Kristina met with Harris at Thompson Law to amend the Shirley A. Hickey Living Trust. The First Amendment and Restatement of the Trust was executed on September 7, 2016, and provided, in part:

> While I am alive, I may at any time or times amend any provision of my Trust Agreement or revoke my Trust in whole or in part subject to the following. If I am serving as a Co-Trustee, then my Co-Trustee shall have to approve and sign off in writing on any amendment or revocation of my Trust. If my Co-Trustee does not approve, any attempted amendment or revocation by me shall be null and void.

[¶18.] According to Harris, who copyrighted this document, Shirley acknowledged that under this amendment she had no power to sign agreements, pay debt, or take any action without Kristina's approval. In addition, Warren was removed as a successor co-trustee. Shirley's Property Power of Attorney was updated naming Kristina as her property power of attorney. Her Healthcare Power of Attorney was updated to name Kristina as her agent.

[¶19.] Shirley moved to an assisted living facility in Sioux Falls in January 2017. This move, some family members contended, was to distance her from Warren. Others believed that Shirley did not want the Chamberlain community to witness her physical decline. According to Shirley, she chose to leave Chamberlain because she no longer drove and her medical care was in Sioux Falls.

[¶20.] Harris left Thompson Law[6] and joined Swier Law on December 5, 2016, to become "Head of Estate Planning, Business, & Corporate Law." Initially, Shirley's file stayed at Thompson Law.[7] In March 2017, Kristina called Harris about transferring Shirley's file to Swier Law. On March 29, 2017, Kristina, as power of attorney, signed a file transfer authorization. Shirley, individually and as trustee, signed a file transfer authorization the next day.

[¶21.] The file was transferred on April 17, 2017. While the Swier Law Firm claimed that it customarily prepared retainer agreements and fee agreements defining the scope and extent of work, Harris presented neither to Shirley, even though Harris considered Shirley to be her client when the file was transferred. Harris, who had five years of legal experience, informed Kristina by e-mail that work on Shirley's estate would be billed at $275 per hour (a discount from the $325 per hour she charged at Thompson Law) and bills would be sent directly to Kristina rather than Shirley. As the case evolved, Kristina, Shirley's fiduciary, became the "technical client" according to Harris.

[¶22.] Over the course of the next few months, any family harmony that Shirley desired among her children deteriorated. Kristina became convinced that Warren's work on Shirley's properties was subpar and that he overbilled Shirley. Warren was informed that his services were no longer needed. Harris and Kristina

---

6. Swier did not know why Harris left Thompson Law and did not call Carolyn Thompson for a reference. According to Harris, she "proactively reached out to Swier" who agreed to let her "run my own show" rather than remaining an associate at Thompson Law with no ability to make decisions on her own.

7. Shirley's net worth was approximately $10,000,000.

considered having Shirley resign as trustee which would "make her admit to being incompetent," but decided against this course of action. A family meeting in July 2017 to explain Shirley's estate and promissory note to all of her children was, according to Shirley, "awful."

[¶23.]     On August 17, 2017, Shirley called attorney Jack Theeler. She and Cliff had retained his services and referred people to him in the past. The next day, Warren believed he was taking his mother from Sioux Falls to Chamberlain. Shirley directed him to take the Mitchell exit where she met with Theeler at his office while Warren stayed in his car.

[¶24.]     On August 21, 2017, Theeler e-mailed Harris and informed her that Shirley asked him to review her estate plan. He asked for documents and told Harris, "I look forward to working with you for an orderly transition for both of us to better represent our mutual client."

[¶25.]     Harris did not respond to Theeler. Instead, she immediately called Kristina who was unaware of Theeler's involvement, but concerned about Warren's influence over Shirley and taking Shirley to Theeler. In addition, Kristina and Harris were unable to find $400,000 from Shirley's recently-matured CDs, and, Harris believed that Shirley "no longer had the authority or the ability to hire another lawyer."

[¶26.]     Harris testified that she believed that there was an immediate need to request the appointment of a temporary guardian and conservator for Shirley, without notice, pursuant to SDCL 29A-5-315 (Temporary Guardian or Conservator of Protected Person). She consulted with Swier, Henderson, and another Swier

attorney who agreed and prepared a motion and supporting affidavits of Harris, "the attorney representing Shirley A. Hickey," and Shirley's children Kristina and Darren.

[¶27.]     While the Swier Law attorneys recognized that there might be a conflict representing Shirley and her fiduciaries, they agreed that they had an ethical obligation to do so pursuant to Rule 1.14 (Client With Diminished Capacity).[8]  They did not analyze the case under Rule 1.9.  *See supra,* ¶ 1 n.1.  They deemed the representation of Kristina to be on behalf of Shirley and in furtherance of Shirley's desire to have Kristina handle her affairs.  Neither Theeler nor Shirley were informed of Swier Law's intent to file the guardianship proceeding.

[¶28.]     On August 24, 2017, the court entered:

1) A temporary restraining order (without notice) prohibiting Warren from having contact with Shirley,

---

8.     Rule 1.14. Client With Diminished Capacity

(a) When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.

(b) When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.

(c) Information relating to the representation of a client with diminished capacity is protected by Rule 1.6.  When taking protective action pursuant to paragraph (b), the lawyer is impliedly authorized under Rule 1.6(a) to reveal information about the client, but only to the extent reasonably necessary to protect the client's interests.

2) An order granting the motion for temporary guardian and conservator,

3) An order waiving the evaluation of Shirley's incapacity and mental and physical condition required by SDCL 29A-5-306, and,

4) Letters of temporary guardianship and conservatorship.

Shirley was informed of the orders on August 24, 2017 and informed Theeler the next day. Swier sent Theeler an e-mail at 4:30 p.m. on August 24 with the orders attached "understanding that you [Theeler] may be representing Warren Hickey (or other related parties) in this matter."

[¶29.]     On September 7, 2017, Harris provided Swier and Henderson with cursory research on who their client was under Rule 1.14 of the Rules of Professional Conduct which she felt "completely aligns with our viewpoint for Hickey" even though it did not analyze South Dakota law.[9] While this research indicated that in some cases a lawyer may represent the guardian or conservator of a former client if the representation is not completely adverse, it also warned that the best practice would be to bring the matter to the court's attention for resolution after full disclosure.

[¶30.]     The court (Judge Zell) heard the matter on September 13, 2017. Kristina was represented by Swier, Henderson, and Harris of Swier Law. Shirley was represented by Theeler, and Warren was represented by Jack Hieb. The court determined that there did not exist clear and convincing evidence of a need for a guardian for Shirley. The court terminated the temporary guardianship, replaced

---

9.     *In re Discipline of Laprath*, 2003 S.D. 114, 670 N.W.2d 41, discusses Rule 1.14 as it existed at that time.

Kristina with the First National Bank Trust Department as temporary conservator, lifted the temporary restraining order (TRO) against Warren, appointed Theeler's office as Shirley's counsel, and appointed Andrew Damgaard to act as the court representative and investigator pursuant to SDCL 29A-5-310.

[¶31.] Shirley filed an affidavit in support of the petition to revoke the temporary guardianship and conservatorship. Her primary care physician had examined her and found her competent to manage her affairs. Shirley did not believe that Warren manipulated her; she owed Warren the money and wanted him paid. Shirley believed that Kristina had been deceptive and abusive in obtaining the temporary guardianship. She believed Harris misrepresented her interests and disclosed statements protected by attorney-client privilege. She had not waived the privilege. She was "very upset" by Kristina's and Harris' actions.

[¶32.] Notwithstanding the court's order terminating the temporary guardianship and appointing Theeler as Shirley's counsel, the Swier Law Firm did not withdraw from representing Kristina or her petition for a permanent guardianship and conservatorship over Shirley. Prior to the final hearing, the Swier Law Firm continued to file motions and briefs on behalf of Kristina that were directly adverse to Shirley's position in the proceedings.

[¶33.] Damgaard filed his comprehensive report to the court on December 12, 2017. He found that "[w]hile Warren may have had influence over Shirley, there is little or no evidence that Shirley's conduct in her financial affairs and estate planning are the result of Warren's undue influence." He noted that the promissory

note was most likely the driving force behind the guardianship/conservatorship action:

> When Kristina started exercising her powers to act alone, Warren believed he would not be paid. Kristina believed the amount of the note is excessive and began hiring other family members to perform the maintenance and repairs of Shirley's properties. The family was fractured between those who believed Warren should be repaid and those who believed he should be paid at a very significant discount. While Shirley was stuck in the middle of this feud she had little or no decision-making authority over her financial affairs, an area that she controlled and vigilantly sought to keep private most of her life.

Damgaard concluded that Shirley had the capacity to manage her financial affairs with the assistance of an independent, non-relative party. The court heard the matter on January 18, 2018 and denied the petition to appoint a conservator.

[¶34.] That same day, Shirley executed the Removal and Appointment of Trustee for the Living Trust Agreement for Shirley A. Hickey. Kristina was removed as a current co-trustee of the Shirley A. Hickey Living Trust, and the First National Bank Trust Department was appointed as co-trustee. Shirley did so pursuant to Article 3, Section 3 of the Trust which provided, in part, "while I am alive and competent, I shall have the right to add a Trustee, or to remove and replace any other Trustee at any time without cause."

[¶35.] On February 26, 2018, attorney Henderson advised Theeler of "troubling developments." Kristina had been removed from Trust bank accounts and First Bank and Trust requested a wire transfer of $1,000,000 from the Trust's bank account to Warren's bank account. Swier Law was continuing its representation of Kristina despite Theeler's demands for it to withdraw due to a conflict of interest.

[¶36.] On March 6, 2018, Kristina filed a complaint in Brule County against Shirley, the Shirley A. Hickey Living Trust, and the First National Bank in Sioux Falls. Kristina was represented by Swier, Henderson, and Harris. At issue was Shirley's amendment to the Trust removing Kristina as a co-trustee. Kristina asked the court to enforce the Trust's dispute resolution provisions or resolve the issue by declaring the trust amendment null and void, and enjoin the defendants from spending or transferring trust assets until the issues were resolved.

[¶37.] On March 23, 2018, Shirley filed a motion to disqualify Harris and the Swier Law Firm, a motion to change venue, and a motion and request to take judicial notice of the guardianship/conservatorship proceedings. Venue was transferred to Minnehaha County.

[¶38.] On August 20, 2018, the court (Judge Hoffman) held a hearing on the motion to disqualify. Harris and Henderson attended the hearing. Swier did not. The court addressed Henderson:

> [Y]our law partner, Lindsay Harris, used to be Shirley's lawyer, drafted the trust, represented her interests in a fiduciary way. And now your law partner and you are representing an adverse party, suing Shirley Hickey over that exact same trust . . . The concern is the rule prohibits a lawyer from representing an adverse party against a former client in a substantially related matter period . . . That is the basis for their motion to disqualify, and it is the basis to disqualify your firm unless you can explain otherwise. And it's also going to be apparently the basis for you getting countersued in the counterclaim, and it may be the basis why you need to put your insurance carrier on notice. So if I were sitting in your seat, the hair on the back of my neck would have been standing up a long time ago, but apparently it's not standing up on the back of your neck even yet. And I'm confused about that because this looks like a slam dunk conflict of interest to me . . . The motion to disqualify the entire Swier Firm is granted. It's a

slam dunk.  They should have withdrawn – well, they should have never brought this action in the first place.

\* \* \*

Ms. Lippert, you're going to have to get new lawyers.  The motion to disqualify the entire Swier Firm is granted.  It's a slam dunk.  They should have withdrawn -- Well, they should have never brought this action in the first place.  So you're going to have to find -- see if you can find another lawyer that thinks you've got a case.

[¶39.]      The court entered formal findings of fact and conclusion of law.

It concluded:

1.  Under Rule 1.9 of the SDCL Rules of Professional Conduct, "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent."  Violation of this rule is grounds for disqualification of the offending attorneys from continuing to participate as counsel of record in the conflicted matter or to advise or represent that other person in any way in connection therewith.

2.  Attorney Harris and the Swier Law Firm are prohibited by Rule 1.9 from representing Kristina against Shirley, their former client, in this action.  Therefore, attorney Harris and the Swier Law Firm are disqualified from further representation of Kristina herein.

3.  Under Rule 1.7(2) of the South Dakota Rules of Professional Conduct, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if: (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by personal interest of the lawyer."  Violation of this rule is grounds for disqualification of the offending attorneys from continuing to participate as counsel of record in the conflicted matter or to advise or represent that other person in any way in connection therewith.

4.  Attorney Harris and the Swier Law Firm violated Rule 1.7 by representing Kristina against Shirley in this action.  Therefore,

-16-

attorney Harris and the Swier Law Firm are disqualified from further representation of Kristina herein.

5. Rule 1.10 of the South Dakota Rules of Professional Conduct states that "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9." Violation of this rule is grounds for disqualification of the offending attorneys from continuing to participate as counsel of record in the conflicted matter or to advise or represent that other person in any way in connection therewith.

6. Michael A. Henderson, Scott Swier and the Swier Law Office violated Rule 1.10 by representing Kristina against Shirley in this action. Therefore, attorneys Henderson, Swier, and the Swier Law Firm are disqualified from further representation of Kristina herein.

[¶40.] The Disciplinary Board found, in part:

19. Swier and his associates have acknowledged that the bringing of the declaratory judgment action constituted a conflict of interest and should not have been brought by them.[1] Swier and his associates all contend that they were authorized to represent Kristina Lippert in the guardianship and conservatorship proceedings.

20. Swier Law Firm billed Shirley Hickey and her trust more than $144,000.00 of legal fees between April 2017 and September 2018, including thousands of dollars in fees for bringing the declaratory judgment action and contesting their removal as attorneys for Kristina Lippert in that action. Swier made all decisions with regard to billing of clients of his firm, including those charged to Shirley Hickey. The fees were paid from Shirley Hickey's assets.

---

1. The two associates were disciplined by the Board; one by private reprimand and one by admonition.

### ONGOING HICKEY LITIGATION

[¶41.] The declaratory judgment proceeding was terminated on November 19,

2019. According to Swier's attorney, Jeffrey Hurd, there is a current civil lawsuit

where the Estate of Shirley Hickey[10] and her Revocable Trust are the plaintiffs, and the Swier Law Firm and the original co-trustee are the defendants. The damages alleged are all the money expended since August 21, 2017 when Theeler first contacted Swier Law Firm about his representation of Shirley. Over $400,000 is at issue and this amount includes the fees incurred by the trust, the fees incurred by Shirley, the fees charged by Theeler, and the fees paid to Damgaard. It also includes the fees paid to Swier Law Firm.

## THE GELSOMINO COMPLAINT

[¶42.] The day after the Disciplinary Board's hearing on the Theeler complaint regarding Swier's conduct during the Hickey case, the Board received a complaint from J. Terry Gelsomino regarding Swier's representation of him in a real estate matter, Swier Law's ultimate conclusion that it had a conflict of interest and could not represent him, and Swier Law's refusal to return a $3,500 retainer.

[¶43.] Gelsomino is a Florida resident who bought two undeveloped tracts of land in Gregory County and, with friends, began to develop the tracts for hunting. He sold one tract to a friend, and later both agreed to sell their parcels. They hired a real estate firm to list the land. Gelsomino was dissatisfied with the sale price, his partner's actions, and the real estate firm and its agent's actions.

[¶44.] Three South Dakota law firms reviewed Gelsomino's claims and declined to represent him. He contacted Swier on July 15, 2018. Swier agreed to review Gelsomino's documentation only after receiving a $3,500 retainer, "a steep

---

10. Shirley, who was 82 years old, had been under hospice care. She died on September 12, 2019.

discount from what our firm usually charges for a potential civil lawsuit." As in Hickey, Swier failed to prepare the firm's customary retainer and fee agreement.

[¶45.]        By e-mail dated October 3, 2018, Gelsomino told Swier that his claim might include a claim against Juffer Realty and its agent, Joe Duling. While Swier read the e-mail, he claims to have missed the reference to Juffer Realty. Swier had previously represented Juffer Realty and its owner.

[¶46.]        Swier assigned the case to Taylor Hayes, a newly-hired attorney in his Sioux Falls office, and asked him to review and assess the file. In November 2018, Hayes advised Swier that Gelsomino wanted to bring a claim against Juffer Realty. Swier did not tell Hayes of any conflict and Hayes continued to work on the file.

[¶47.]        In late January 2019, Swier informed Hayes of the conflict. Hayes suggested refunding the retainer. On February 1, 2019, Hayes wrote to Gelsomino and advised him that Swier Law would be unable to represent him because of the conflict of interest. The $3,500 retainer was not returned, and the Swier Law Firm billed Gelsomino an additional $804.

[¶48.]        During the September 12, 2019, disciplinary hearing, Swier admitted that he missed the reference to Juffer Realty in Gelsomino's October 3, 2018 e-mail and should have identified the conflict of interest before billing.

[¶49.]        The Disciplinary Board found, in part:

> 32.    In the course of the September hearing, Swier insisted that keeping the $3,500.00 retainer Gelsomino paid was appropriate because the Swier associate spent the time required to evaluate the documents Gelsomino provided. Swier maintained the evaluation was of benefit to Gelsomino. After a brief recess at the request of Swier's counsel and continued interrogation by members of the Board, Swier stated he had

> reconsidered and should return the $3,500.00 retainer to Gelsomino.
>
> 33. As of the date of the September 12, 2019 hearing, no refund had been made to Gelsomino for the $3,500.00 fee charged by Swier Law Firm to review the materials sent and draft a complaint.
>
> 34. The Board exonerated Swier's associate as having had no knowledge of the conflict of interest and only doing such acts as were directed by his supervising attorney, Swier.

The $3,500 retainer has since been returned to Gelsomino.

## DISCIPLINARY BOARD

[¶50.] Because the Theeler complaint involved Swier Law attorneys Harris and Henderson, the Disciplinary Board kept the record open following its June 17, 2019 hearing concerning Swier. On September 12, 2019, it held separate disciplinary hearings with Harris, who had since left Swier Law, and with Henderson concerning the allegations in the Theeler complaint, and with Hayes regarding Gelsomino.

[¶51.] That afternoon, the Board resumed its hearing regarding the Swier/Hickey representation. The Board's attorney told Swier that the Board heard testimony from Henderson and Harris "[a]nd had some testimony quite contrary to some of what you've said." The Board also held its hearing on the Gelsomino complaint against Swier.

[¶52.] The Board entered findings of fact and conclusion of law. Of particular interest, the Board found "Swier was not fully credible nor candid in his testimony on June 17, 2019 and September 12, 2019."

[¶53.] The Disciplinary Board recommends that this Court discipline Swier:

1. By public censure for violating Rule 1.9 (a), Rule 5.1 and Rule 8.4 (a) and (d) of the South Dakota Rules of Professional Conduct.

2. By ordering and directing Swier to acknowledge the public censure on his website for a period of one year, commencing thirty days after entry and filing of the same by the Supreme Court, so that the public is made aware of the rules violations; the form of acknowledgement to be approved by the Disciplinary Board.

3. Swier has thirty (30) days in which to admit or deny the allegations of the formal accusation pursuant of SDCL § 16-19-68 [sic].[11]

4. If the allegations be denied by Swier, the matter may be referred to a Referee pursuant to SDCL § 16-19-68, [sic] or the Supreme Court may determine the appropriate discipline.

[¶54.]     Because Swier admitted the allegations, this Court "may proceed to render judgment." SDCL 16-19-67(3).

## STANDARD OF REVIEW

[¶55.]     The Disciplinary Board conducted four detailed hearings in this matter and compiled a voluminous record before entering findings of fact, conclusions of law, and a recommendation of public censure. "Because [the Board] had the advantage of seeing and hearing the witnesses, this Court gives careful, due consideration to [the Board's] findings." *In re Discipline of Mattson*, 2002 S.D. 112, ¶ 38, 651 N.W.2d 278, 285 (citations omitted). Swier has admitted the allegations

---

11.    SDCL 16-19-68 was repealed by 2016 S.D. Sess. L., ch. 246 (Supreme Court Rule 16-47), effective July 1, 2016. SDCL 16-19-67 was rewritten in 2016. 2016 S.D. Sess. L., ch. 246 (Supreme Court Rule 16-46). It was rewritten again in 2018. 2018 S.D. Sess. L., ch. 298 (Supreme Court Rule 18-07), effective July 1, 2018. SDCL 16-19-67 provides that the findings of fact, conclusions of law, and recommendation of the investigating agency constitutes a formal accusation and details how formal disciplinary proceedings shall be conducted.

in the formal accusation and does not dispute the facts. This Court, therefore, may adopt the Board's findings. *See In re Discipline of Willis*, 371 N.W.2d 794, 797 (S.D. 1985); *In re Discipline of Strange*, 366 N.W.2d 495, 497 (S.D. 1985).

[¶56.] "The final determination for the appropriate discipline of a member of the State Bar rests firmly with the wisdom of this Court." *In re Discipline of Wehde*, 517 N.W.2d 132, 133 (S.D. 1994). Accordingly, we do not "defer to the Disciplinary Board's recommended sanction." *In re Discipline of Reynolds*, 2009 S.D. 9, ¶ 48, 762 N.W.2d 341, 352.

## DISCIPLINARY GOALS

[¶57.] The purpose of the attorney disciplinary process is not to punish the attorney. *In re Petition of Pier*, 1997 S.D. 23, ¶ 8, 561 N.W.2d 297, 299. Two of its goals are: "1) the protection of the public from further fraudulent, unethical or incompetent activities involving this attorney; and 2) the preservation of the image and integrity of the attorneys, the bar association and the legal profession as a whole." *In re Discipline of Simpson*, 467 N.W.2d 921, 921-22 (S.D. 1991). A third goal is to deter like conduct by other attorneys. *In re Discipline of Eicher*, 2003 S.D. 40, ¶ 24, 661 N.W.2d 354, 363. "The real and vital issue to be determined is whether or not the accused, from the whole evidence as submitted, is a fit and proper person to be permitted to continue in the practice of law." *Simpson*, 467 N.W.2d at 922.

[¶58.] This Court has long held that "[a] certificate of admission to the bar is a pilot's license which authorizes its possessor to assume full control of the important affairs of others and to guide and safeguard them when, without such

assistance, they would be helpless." *In re Egan*, 52 S.D. 394, 402, 218 N.W. 1, 4

(1928) (quoting *In re Kerl*, 188 P. 40, 41 (Idaho 1920)).

> A license to practice law in this state is a privilege and a
> continuing proclamation by the Supreme Court that a licensed
> attorney is an officer of the Court, is fit to be entrusted with
> legal and judicial matters, and is able to aid in the
> administration of justice. It is the duty of an attorney to act,
> both professionally and personally, in conformity with the
> standards of conduct governing members of the bar.

SDCL 16-19-31.

[¶59.]     The South Dakota Constitution places with this Court the affirmative

duty to "govern terms of courts, admission to the bar, and discipline of members of

the bar." S.D. Const. art. V, § 12. "We take this obligation most seriously."

*Reynolds*, 2009 S.D. 9, ¶ 49, 762 N.W.2d at 352.

## LEGAL ANALYSIS

### A.

### *The Theeler Complaint*

[¶60.]     It is a basic, fundamental principle of law "that an attorney, while

representing a client, must not do anything knowingly that is inconsistent with the

client's best interests." *Laprath*, 2003 S.D. 114, ¶ 45, 670 N.W.2d at 56.

> The nature of the relationship between attorney and client is
> highly fiduciary. It consists of a very delicate, exacting and
> confidential character. It requires the highest degree of fidelity
> and good faith. It is a purely personal relationship, involving
> the highest personal trust and confidence.

*Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259, 264 (S.D. 1988).

[¶61.] So, too, "[t]he concept that a lawyer must not simultaneously represent parties whose interests are opposed is not a new one." Richard E. Flamm, *Lawyer Disqualification: Disqualification of Attorneys and Law Firms* § 4.2 (2d ed. 2014).

> It can be traced back at least as far as the Book of Matthew, which decreed that "no one can serve two masters, for either he will hate the one and love the other, or he will be devoted to the one and despise the other"- and perhaps even farther than that. This edict has been applied to lawyers since long before the organized bar began adopting codes of ethics designed to regulate their conduct; by the Seventeenth Century it was well settled that an attorney could not properly represent parties who had opposing interests without their consent. The edict is sometimes still adverted to today.

*Id.* (footnotes omitted).

[¶62.] The Preamble to the South Dakota Rules of Professional Conduct, adopted by the State Bar of South Dakota, provides "general orientation" and cautions:

> In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system and to the lawyer's own interest in remaining an ethical person while earning a *satisfactory* living. The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Within the framework of these Rules, however, many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules. These principles include a lawyer's obligation zealously to protect and pursue a client's legitimate interests, within the bounds of the law, while maintaining a professional, courteous and civil attitude toward all persons involved in the legal system.

SDCL Chapter 16-18 app. (emphasis added).

[¶63.]     A retired Justice of this Court observed:

> In most cases, a lawyer's moral compass and professionalism
> prompt the ethically correct course of action. But at other times,
> the nuances of the situation call for more technical guidance.
> The consequences of ignoring a conflict can be dire for all
> concerned. For lawyers, it could mean malpractice lawsuits or
> disciplinary actions, including disbarment.

Judith K. Meierhenry, *Confidentiality and Conflicts of Interest*: *A Guide for South Dakota Lawyers*, 59 S.D. L. Rev. 557, 559 (2014).

[¶64.]     Moreover, the statutory oath for admission to become a licensed attorney in South Dakota states, in part: "I will maintain the confidence and preserve inviolate the secrets of my client . . . ." SDCL 16-16-18.[12] This is not a one-time obligation; "[e]ach day of an attorney's [professional] life demands that these requirements be met anew." *Laprath*, 2003 S.D. 114, ¶ 79, 670 N.W.2d at 65 (quoting *Eicher*, 2003 S.D. 40, ¶ 25, 661 N.W.2d at 363). That is not compatible, under the facts of this case, with publicly litigating against a client or former client.

[¶65.]     Theeler e-mailed Harris on August 21, 2017 and told her, in part:

> I have met with Shirley Hickey. She has asked that I represent
> her interests in reviewing her estate plan. I am aware of the
> family meeting you had with Shirley and her family.
>
> * * *
>
> I look forward to working with you in an orderly transition for
> both of us to better represent our mutual client, Shirley.

---

12.     When swearing in new attorneys, former Chief Justice Robert A. Miller would always observe that if each attorney in South Dakota would read the oath of attorney once a year, there would be little or no need for a Disciplinary Board.

Harris, Swier, and Swier Law chose not to respond to Theeler's e-mail. A simple phone call in response to Theeler could have clarified the level of his representation; Warren's involvement, if any; and, Shirley's current competency since Theeler met with her personally a few days before. A simple phone call may have avoided the ongoing litigation that was spawned by this matter and the disciplinary proceedings involving three Swier Law Firm attorneys. And, a simple phone call may have saved Shirley and her trust an enormous amount of money.[13]

[¶66.] Swier claims that he knew very little about Shirley or her trust. He never met her or talked to her. He relied upon Harris' statement of the factual basis of the emergency guardianship proceeding and her legal analysis of a potential conflict of interest after that proceeding commenced. He made no independent investigation of the facts or the law. However, Swier continued to appear as counsel of record on all the pleadings in the proceedings. He also reviewed all the client invoices and would have been well aware of the amount of money his firm was paid from Shirley's trust while continuing to be involved in proceedings that were adverse to Shirley.

[¶67.] Swier was involved in the decision making and tactical decisions to not give Theeler notice of the guardianship proceeding, and to withhold the documents Theeler requested. He failed to recognize a conflict of interest long before the

---

13. Between April 2017 and September 2018, Swier Law billed Shirley and her trust for legal fees totaling over $144,000. We refer attorneys to Rule 1.5 (Fees). We note that Shirley was billed for research regarding whether Swier Law had a conflict of interest and for litigation where her interests and those of Kristina were adverse. This figure does not include the fees paid to Jack Theeler for his representation of Shirley or to Andrew Damgaard for his services as a court appointed representative and investigator.

declaratory judgment action and failed to exercise independent professional judgment. His claim that he deferred to Harris, his estate planning associate, and Henderson, a litigator and salaried employee, whom Swier considered to be Harris' supervisor in the guardianship and declaratory judgment proceedings does not mitigate his conduct. This is particularly the case given the extent of Swier's managerial and financial control over the firm, and his reluctance to acknowledge obvious conflicts, even before the Disciplinary Board.

[¶68.] Swier had the fiduciary obligation "not to encourage either the commencement or continuance of an action or proceeding from any motive of passion or interest." SDCL 16-18-16. Swier had many opportunities to analyze whether Swier Law had a conflict in the Hickey matter before, during, and after the guardianship proceeding and before instituting the declaratory judgment action. By bringing an action against Shirley, a former client, he violated Rule 1.9. By impeding the resolution of the Hickey dispute, Rule 8.4(a) and (d) were violated.

[¶69.] It is clear that Swier did not understand his obligation as a managing attorney. While he said he was always available to answer attorney-employee questions, "more is required than [for] the supervisor [to] be 'available.'" *In re Ritger*, 556 A.2d 1201, 1203 (N.J. 1989) (pointing out the need for a systematic, organized routine for periodic review of files).

[¶70.] A continuing theme in this disciplinary proceeding is Swier's inability, or unwillingness, to identify and resolve conflicts of interest. While he claimed that a check through Swier Law's billing system would catch conflicts, attorney employees did not have access to this. In addition, the nature of conflicts is often

more complex, and conflicts were not identified under Swier's system in *Berggren*, *see supra* ¶¶ 7-9, in the Theeler complaint, or in Gelsomino, *infra*. Swier had no policy in place to identify conflicts when Harris, a relatively inexperienced attorney, left Thompson Law. He relied on Harris' opinion on conflicts rather than independently assessing it and consulting Rule 1.9. Swier claimed that he had developed a manual for addressing conflicts during the months between the July and September disciplinary hearings and briefed his attorneys concerning its content. According to Hayes, this did not occur.

[¶71.] Rule 5.1 places on Swier, as the partner and manager of Swier Law Firm, the obligation to make reasonable efforts to ensure that all of the lawyers in Swier Law conform to the South Dakota Rules of Professional Conduct. Rule 5.1(a) requires lawyers with management authority:

> to make reasonable efforts to establish internal policies and procedures designed to provide reasonable assurance that all the lawyers in the firm will conform to the Rules of Professional Conduct. Such policies and procedures include those designed to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property and ensure that inexperienced lawyers are properly supervised.

Rule 5.1 cmt. [2].

[¶72.] It was only when pressed at the Disciplinary Board hearing that Swier recognized that he was the supervisory attorney in Swier Law Firm, admitted that Theeler should have been given notice and documentation, and recognized that Swier Law "had a conflict from the very beginning."

B.

*The Gelsomino Complaint*

[¶73.]    In an October 2018 e-mail, Gelsomino informed Swier of a potential claim against Juffer Realty.  Swier, who previously represented Juffer Realty, claimed to "miss" the reference to Juffer Realty in the e-mail.  However, in November 2018, when Swier claimed he first became aware of the conflict, he directed attorney Hayes to continue to work on the file.  Two months later, he informed Hayes of the conflict, withdrew from representation, and refused to return the retainer.  It was only after pointed questioning by the Disciplinary Board and a recess with his attorney that Swier acknowledged that the retainer should be refunded to Gelsomino.

[¶74.]    Swier claims he initially "missed" the conflict of interest with Gelsomino and did not immediately withdraw.  This is another example of the haphazard management of Swier Law and procedural failure by Swier to identify conflicts.  However, even when Swier admits he knew of the conflict, he did not withdraw.  Rather, he directed attorney Hayes to continue researching and billing Gelsomino.  He did not inform Hayes of the conflict for two months and exposed him to potential disciplinary action.  As such, he failed to exercise appropriate supervisory responsibilities over his associates, failed to assure that his attorneys conformed to the South Dakota Rules of Professional Conduct, and failed to personally conform to those rules.  Rule 5.1.

C.

*Disciplinary Board Proceedings*

[¶75.]     The Disciplinary Board specifically found that "Swier was not fully credible nor candid in his testimony on June 17, 2019, and September 12, 2019." By admitting the formal accusation, Swier does not dispute this assessment.[14] Swier's demeanor at the Board's hearing was also of concern. Swier's attorney noted:

> And I think maybe restraint and—he—I'll tell you, he sucks at it in front of this group. But when he's not in front of you, he is far more chastened in his appearance than he seems here.

[¶76.]     "The foundation of an attorney's relationship with clients and the legal system is trust." *Mattson*, 2002 S.D. 112, ¶ 55, 651 N.W.2d at 289 (quoting *In re Discipline of Tidball*, 503 N.W.2d 850, 856 (S.D. 1993) (additional citations omitted). A lack of candor with the Disciplinary Board violates that trust. *See In re Discipline of Arendt*, 2004 S.D. 83, ¶ 15, 684 N.W.2d 79, 82. Rule 3.3 of the Rules of Professional Conduct requires candor toward tribunals including the Disciplinary Board. *See* Rule 1.0(m) (defining tribunal). And, attorneys have the duty to maintain the respect due to courts and judicial officers. SDCL 16-18-13.

> We cannot overemphasize the importance of attorneys in this state being absolutely fair with the court. Every court . . . has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it. Therefore, candor and fairness should characterize the conduct of an attorney at the beginning, during, and at the close of the litigation.

---

14.    On September 12, 2019, the Disciplinary Board had hearings concerning Harris, Henderson, and Hayes. The Board also had a hearing with Swier on the Theeler complaint and told him that Harris and Henderson provided testimony that was contrary to his testimony. In the hearing that day with Swier regarding Gelsomino, the Board told Swier that Hayes was unaware of any new office procedures to detect conflicts of interest.

*In re Discipline of Dorothy*, 2000 S.D. 23, ¶ 51, 605 N.W.2d 493, 509 (quoting *In re Discipline of Bihlmeyer*, 515 N.W.2d 236, 239 (S.D. 1994)). One of the purposes of attorney discipline is to avoid repetition of the misconduct. The Disciplinary Board found that Swier lacked credibility and candor. This finding does not weigh in Swier's favor and does not convince this Court that there is little likelihood of repetition in the future.

D.

*Oral Argument Before This Court*

[¶77.]        At oral argument, counsel for the Disciplinary Board told the Court that the Board's recommendation of public censure was based on Swier's ultimate recognition of the conflicts in Hickey and Gelsomino, Swier's efforts to change Swier Law Firm's practices and procedures, and Swier's change in attitude throughout the two Disciplinary Board hearings. Counsel concluded, however, that this case is one of first impression; there is no case "on all fours" with it.

[¶78.]        Oral arguments in attorney disciplinary proceedings differ from other appellate arguments because the accused attorney "shall appear in person" unless excused by the Court, SDCL 16-19-68.1, and is given the opportunity to address the Court. In his opening remarks, Swier told the Court that the two most important things in his life are the ability to have a family and "be a really good lawyer." For twenty years, according to Swier, he has been "exceptional" in both of these situations and for twenty years there has never been an "inkling" of a complaint until the Theeler and Gelsomino complaints. He made no mention of the *Berggren* matter, however. *See supra* ¶¶ 7-9.

[¶79.] Our review of the record left the Court with the impression that Swier ignored what he knew were conflicts, was too slow to take corrective measures, and showed no true remorse. Oral argument confirmed our impression of the record. Swier used his opportunity before the Court to promote himself and Swier Law Firm during what can charitably be characterized as an "infomercial." He lacked sincerity and remorse and any attempt at either was pro forma. It was hardly the central focus of his presentation to this Court.

APPROPRIATE DISCIPLINE

[¶80.] "Appropriate discipline is determined upon a consideration of the seriousness of the misconduct by the attorney and the likelihood of repeated instances of similar misconduct." *Dorothy*, 2000 S.D. 23, ¶ 52, 605 N.W.2d at 509. SDCL 16-19-35 prescribes the disciplinary options available to this Court. They are public censure, placement on probationary status, suspension for a specific period not to exceed three years, and disbarment.

[¶81.] While the Disciplinary Board has recommended public censure, we find this recommendation too lenient under the facts of this case.

[¶82.] Swier Law maintains multiple offices over a vast geographical area in South Dakota. Under the "business model" Swier developed, he is the sole shareholder who is primarily responsible for its proper management and solely responsible for its billings and finances. The attorneys in the firm are employees. Therefore, Swier, who also maintains a full caseload, has the obligations and duties of managing and supervising attorneys pursuant to Rule 5.1. It is apparent that in the Theeler and Gelsomino complaints, Swier did not have office procedures and

policies to identify conflicts of interest, was unaware of his responsibilities as a managing attorney, delegated decision-making and supervisory authority to employees, and continued representation when he knew conflicts existed. In part, because of Swier's lack of management and knowledge of the Rules of Professional Conduct, the majority of the attorneys in Swier Law Firm faced disciplinary proceedings. His "business model" was haphazard and chaotic. While he offered to change whatever the Disciplinary Board suggested, the management of Swier Law Firm is not the role of the Disciplinary Board.

[¶83.] Of grave concern, is Swier's lack of full candor and credibility with the Board. By trying to defend his actions initially before the Board and coming to accept responsibility only through capitulation, Swier continued the same troubling pattern of behavior that he exhibited in the underlying complaints. In both instances, he unjustifiably refused to take appropriate action to address conflicts even after they were apparent. Given this, we have a low degree of confidence that the solemnity of these disciplinary proceedings and the Board's proposed sanction will, themselves, effect the lasting change necessary to protect the public.

[¶84.] Under these circumstances, this Court cannot proclaim that Swier "is fit to be entrusted with legal and judicial matters, and is able to aid in the administration of justice." SDCL 16-19-31. His acts were not merely isolated, foolish, and negligent; they were intentional. *In re Discipline of Hopewell*, 507 N.W.2d 911, 917 (S.D. 1993).[15] His actions brought disrepute on the legal

---

15. Swier's "defense" of ignorance or negligence cannot save the day for him. Negligence in such instances falls below professional attorney competency

(continued . . .)

profession and have injured the reputation of the bar. His new-found sense of pro forma remorse came only after two judges recognized Swier Law Firm's shortcomings in Hickey, and the Disciplinary Board and his own young associate recognized Swier's ethical lapse in Gelsomino.

[¶85.]     This Court concludes that the appropriate discipline in this case is that Swier be suspended from the practice of law for a period of one year, effective thirty days after the entry of the order imposing suspension. SDCL 16-19-77. Should Swier pay back $144,000 to Shirley's estate and trust, the period of suspension from the practice of law shall be reduced to six months.[16] Swier must comply with the requirements of SDCL 16-19-77 through SDCL 16-19-80 regarding a suspended attorney's duties to wind up business, give notice to office clients of suspension, give notice to counsel and clients involved in litigation and administrative proceedings, and file an affidavit of compliance with this Court.

[¶86.]     Before Swier may petition for reinstatement, SDCL 16-19-83, he must:

1. Pass the Multistate Professional Responsibility Examination;

2. Successfully complete a law office management course approved by this Court, and;

---

(. . . continued)

standards. *Laprath*, 2003 S.D. 114, ¶ 78, 670 N.W.2d at 64. Negligent acts can harm a client just as much as intentional acts. *See Reynolds*, 2009 S.D. 9, ¶ 58, 762 N.W.2d at 353-54. Regardless of the motive, this conduct lowers the purpose and image of an attorney in the eyes of the public, the ultimate beneficiaries of the attorney's professional legal services.

16.    During oral argument, counsel for the Disciplinary Board told the Court that the Board has no authority to order restitution or disgorgement, but the Board can "use leverage." Swier's counsel conceded that this Court can do so under its "inherent power to supervise the conduct of attorneys who are its officers." SDCL 16-19-20.

3. Reimburse the State Bar of South Dakota and the Unified Judicial System expenses allowed under SDCL 16-19-70.2.

[¶87.]    Furthermore, Swier must submit an affidavit to this Court stating under oath that:

1. He has reviewed the Oath of Attorney and the Rules of Professional Conduct;

2. He fully recognizes that his conduct violated the Rules of Professional Conduct by which he is bound;

3. He pledges to devote every effort in his future practice to fully abide by the Rules of Professional Conduct and Oath of Attorney, and;

4. Upon reinstatement, he will maintain professional malpractice insurance along with proof thereof.

[¶88.]    Swier may file a petition for reinstatement upon the expiration of his suspension pursuant to SDCL 16-19-84 to SDCL 16-19-87.

[¶89.]    JENSEN and SALTER, Justices, and MEANS and SABERS, Circuit Court Judges, concur.

[¶90.]    MEANS, Circuit Court Judge, sitting for KERN, Justice, disqualified.

[¶91.]    SABERS, Circuit Court Judge, sitting for DEVANEY, Justice, disqualified.